865 So.2d 98 (2003)
William R. ROBINSON and Michelle L. Robinson, Individually and on Behalf of Their Minor Children, Leanna Robinson, David Robinson and Lynn Robinson
v.
NORTH AMERICAN SALT COMPANY.
No. 2002 CA 1869.
Court of Appeal of Louisiana, First Circuit.
June 27, 2003.
Rehearing Denied August 13, 2003.
*101 Julius W. Grubbs, Jr., New Iberia, Counsel for Plaintiffs-Appellees.
Mark L. Riley, Lafayette, Counsel for Defendant-Appellant North American Salt Company.
Gary J. delaHoussaye, Lafayette, Counsel for Defendant-Appellee Superior Service Company, Inc.
Melvin A. Eiden, Lafayette, Counsel for Intervenor-Appellee Business Insurance Company.
Denis Paul Juge, Metairie, Counsel for Amicus Curiae Louisiana Association of Business and Industry.
Before: PARRO, McDONALD, and CLAIBORNE,[1] JJ.
CLAIBORNE, J.
This is an appeal by the defendant, North American Salt Company (NAS), from a trial court judgment in favor of the plaintiffs, William and Michelle Robinson, individually and on behalf of their minor children, Leanna, David, and Lynn Robinson, in the total amount of $1,377,509.20, with legal interest from the date of judicial demand until paid, plus all court costs, including expert fees in the amount of $5,447.29.

FACTUAL AND PROCEDURAL BACKGROUND
NAS is the owner and operator of a salt mine located on Cote Blanche Isle in St. Mary Parish, Louisiana. In October of 1997, NAS entered into a contract with Superior Service Company, Inc. (Superior) whereby Superior would provide personnel to perform maintenance work on the surface conveyor system NAS uses to bring salt out of the mine to barges for transportation. As a part of the contract, it was agreed that the employees of Superior who were performing the maintenance work would be the statutory employees of NAS. Plaintiff William Robinson was one of the Superior employees assigned to work on the project at the salt mine.
NAS's conveyor system consists of a conveyor belt about 548 feet long, supported by a bridge-like structure, which runs from the mine to the waiting barges. The conveyor belt is located outdoors, and in some places it is close to the ground, while in others it is elevated and quite far from the ground. The maintenance project involved replacing the rollers on the conveyor belt, which required that the Superior employees fabricate clips for the *102 rollers, clean rust from the frame of the conveyor in the areas where the clips would be installed, cut holes for the clips, install the clips, and then install the rollers on the clips. Norris Hebert was NAS's project engineer in charge of the project, and Robert Durocher was Superior's foreman who would supervise the employees at the job site. In November of 1997, prior to the commencement of any work on the conveyor system, Mr. Hebert and Mr. Durocher met to discuss the details of the job. Although the conveyor belt would have to be shut down in order to perform the installation of the rollers, Mr. Hebert told Mr. Durocher that he did not want to shut the conveyor belt down and halt production at the mine while the Superior employees performed the rest of the work, i.e., cleaning the rust from the frame of the conveyor, cutting holes for the clips, and installing the clips.
On November 10, 1997, Mr. Durocher installed one set of clips and a roller. He performed this work on a section of the conveyor system that was not elevated, and therefore, he was able to do it while standing on the ground. Although the belt was shut down while he installed the roller, he performed the rest of the work while the belt was running. At that time, Mr. Durocher told Mr. Hebert that he believed the work could be performed safely while the conveyor belt was running.
On December 15, 1997, having finished fabricating the clips for the rollers, the Superior employees began the job of cleaning the conveyor structure and installing the clips. They did this work for part of the day and also did other work that did not require them to work in direct contact with the conveyor system. They resumed their work the next day. The Superior employees were required to use a man lift in order to work on the elevated portions of the conveyor system. On December 16, 1997, Mr. Robinson was working from the bucket of the man lift, using a chipping hammer to chip rust away from the frame of the conveyor. He was working in a small space very close to the moving conveyor belt and also very close to a "pinch-point," meaning a point near one of the rollers in which objects could be caught. After several hours of working on the conveyor belt frame, Mr. Robinson's chipping hammer struck the moving belt, causing the hammer and his entire arm to be pulled into the space between the belt and nearby roller, resulting in severe injuries to his arm, shoulder, and back.
Mr. Robinson and his wife filed suit against both NAS and Superior, alleging claims of negligence and intentional tort. Business Insurance Company (BICO), Superior's workers' compensation insurer, intervened in the lawsuit seeking reimbursement of workers' compensation benefits and medical expenses it had paid to Mr. Robinson. After determining that NAS was in fact the statutory employer of Mr. Robinson, his negligence claims were dismissed, leaving the lawsuit as a pure intentional tort claim against Mr. Robinson's direct employer, Superior, and his statutory employer, NAS.
Both defendants filed motions for summary judgment, which were denied. Several months later they reurged their motions, and the trial court granted Superior's motion and dismissed Mr. Robinson's claims against it. The trial court denied NAS's motion for summary judgment with respect to Mr. Robinson's claims, but granted it with respect to BICO's claim in intervention against NAS for reimbursement of workers' compensation benefits. However, the intervention by BICO as against Mr. Robinson was not dismissed, and the trial court ruled that Mr. Robinson would be allowed to present all evidence as to *103 medical expenses and lost wages and that NAS would receive no credit for the workers' compensation benefits and medical expenses paid by BICO.
Trial on the merits was held beginning on December 17, 2001. At the close of the plaintiffs' case, NAS made a motion for directed verdict, which was denied by the judge. On December 20, 2001, the jury returned a verdict in favor of the plaintiffs. The jury awarded a total judgment of $1,010,000.00, broken down into the following damage awards:

William Robinson
 1. Past Medical Expenses 0
 2. Future Medical Expenses $300,000.00
 3. Past Lost Wages $100,000.00
 4. Future Lost Wages & Earning Capacity $400,000.00
 5. Permanent Disability & Impairment 0
 6. Past Physical & Mental Pain & Suffering $ 20,000.00
 7. Future Physical & Mental Pain & Suffering $100,000.00
 8. Loss of Enjoyment of Life $ 50,000.00
Michelle Robinson
 1. Loss of Consortium $ 10,000.00
Leanna Robinson, Minor Child
 1. Loss of Consortium $ 10,000.00
David Robinson, Minor Child
 1. Loss of Consortium $ 10,000.00
Lynn Robinson, Minor Child
 1. Loss of Consortium $ 10,000.00

At some point during the trial, plaintiffs' counsel notified the trial court that all the parties had worked out a settlement with BICO, which was the reason BICO was not present to litigate at the trial. After the jury verdict was rendered, the judge signed an order dismissing BICO's claims from the lawsuit. A judgment was then signed in accordance with the jury verdict, and both Mr. Robinson and NAS filed motions for judgment notwithstanding the verdict. The trial court denied NAS's motion and partially granted Mr. Robinson's motion by increasing parts of the damage award. The jury had not awarded anything for Mr. Robinson's past medical expenses, and the trial court granted the JNOV with respect to that award and awarded Mr. Robinson $107,509.28, which is the amount of past medical expenses stipulated by the parties at trial. The court increased the award for past physical and mental pain and suffering from $20,000.00 to $135,000.00, and also awarded $125,000.00 for permanent disability and impairment, for which the jury had awarded nothing. The court also increased Michelle Robinson's loss of consortium award from $10,000.00 to $30,000.00. The JNOV increased the total judgment from $1,010,000.00 to $1,377,509.20, and NAS now appeals the judgment rendered in accordance with the jury verdict and the various rulings of the trial court.

LAW AND ANALYSIS

Intentional Act
NAS's main argument is that the facts of this case do not rise to the level of an intentional act for purposes of the exception to the exclusive remedy provision *104 of workers' compensation found in La. R.S. 23:1032(B), which provides that "[n]othing in this Chapter shall affect the liability of the employer ... civil or criminal, resulting from an intentional act." The Louisiana Supreme Court has held that the meaning of "intent" in this context is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Reeves v. Structural Preservation Systems, 98-1795 (La.3/12/99), 731 So.2d 208, 211.
"Substantially certain to follow" requires more than a reasonable probability that an injury will occur, and "certain" has been defined to mean "inevitable" or "incapable of failing." Believing that someone may, or even probably will, eventually get hurt if a workplace practice is continued does not rise to the level of an intentional act, but instead falls within the range of negligent acts that are covered by workers' compensation. Reeves, 731 So.2d at 212-13.
The supreme court has always narrowly construed the intentional act exception and has held that violation of a statute is not per se such an intentional act as will result in an employer's tort liability. Likewise, the courts of appeal have narrowly construed the intentional act exception and have almost universally held that employers are not liable under the intentional act exception for violations of safety standards or for failing to provide safety equipment. Reeves, 731 So.2d at 211.
In Reeves, the plaintiff was injured while manually moving a sandblasting pot in the course and scope of his employment as a general laborer. OSHA required that a sticker be placed on the sandblasting pot which read "DO NOT MOVE MANUALLY," and on previous job sites, the pot had been moved by a forklift. However, at this particular job site, the plaintiff's supervisor had requested a forklift several times, but the employer had never provided one. The supervisor testified that he feared someone would eventually get hurt moving the pot manually, and for that reason, he sometimes moved the pot manually himself. Other employees had moved the pot manually on numerous occasions without being injured, and the plaintiff himself had done so several times without complaint and without ever having any trouble. On the day of the accident, the supervisor directed the plaintiff to move the sandblasting pot about 40-50 feet and then, after the plaintiff had moved it about halfway with no trouble, directed another employee to help him. The supervisor testified that he felt the two employees could move the pot safely. However, as they attempted to do so, it fell over on the plaintiff and injured him. Reeves, 731 So.2d at 209.
The plaintiff filed suit against his employer, alleging that his injuries were caused by his employer's intentional acts and, therefore, fell outside the realm of workers' compensation. After a jury trial, the jury found that the employer's actions were intentional and awarded him damages for pain and suffering, lost wages, and past and future medical expenses. The Third Circuit affirmed, finding the record reflected the employer knew that the sandblasting pot could not be moved safely without a tow motor, knew that moving it manually violated OSHA safety regulations, and yet failed to provide the appropriate equipment. Reeves, 731 So.2d at 209.
The supreme court reversed, finding the jury's conclusion that the employer's conduct constituted an intentional act was not reasonable in light of the record reviewed *105 in its entirety, and there was no evidence presented that the accident was "substantially certain" to occur. Accordingly, the court found the jury had committed manifest error in determining the employer's conduct rose to the level of an intentional act for purposes of the exception to the exclusive remedy of workers' compensation, and the court of appeal had erred in affirming the jury's decision. Reeves, 731 So.2d at 213. While the facts in the instant case are similar in some respects to those of Reeves, we find it distinguishable and, therefore, affirm the judgment in favor of the plaintiffs.
Although NAS asserts that its conduct does not rise to the level of an intentional act as a matter of law and that the jury committed legal error, we must, as did the supreme court in Reeves, apply the manifest error standard of review. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The plaintiffs' expert, Stephen Killingsworth, who was accepted by the court as an expert in the field of mechanical engineering, testified that it was a violation of NAS's own safety policy and procedures for Mr. Robinson to be working so closely to the conveyor belt without it being "locked out and tagged out," meaning shut down, locked, and tagged with the initials of the worker who shut it down. According to Mr. Killingsworth, due to the type of work being performed on the conveyor system by the Superior employees, it was a violation of the safety policy for Norris Hebert to ask them to perform the work while the belt was running. However, as noted by the supreme court in Reeves, violations of safety standards or even OSHA regulations alone do not make an employer liable under the intentional act exception. Reeves, 731 So.2d at 211-12. More is required in order to establish that an accident is substantially certain to occur. The supreme court found that such additional evidence was lacking in Reeves, but in the instant case, there was sufficient additional evidence presented from which the jury could reasonably conclude that the employer knew the accident was substantially certain to occur.
In Reeves, the supreme court focused on the fact that the plaintiff, as well as other workers, had moved the sandblasting pot manually on several prior occasions without anyone being injured. This, along with the fact that the plaintiff had already moved the pot halfway by himself with no trouble and the fact that the supervisor believed the plaintiff could do it without injury, made it unreasonable for the jury to conclude that the accident was substantially certain to occur. Reeves, 731 So.2d at 213. NAS argues that this case must be decided the same as Reeves, because Robert Durocher had installed the first set of clips and a roller for the conveyor belt *106 and determined the work (not including the roller installation) could be performed safely while the belt was running, and the Superior employees, consisting of only Mr. Robinson and one other worker, Ricky Dotson, had been working on the conveyor system for about a day and a half before the injury occurred. NAS asserts that, because similar work had occurred before without injury, the injury was not substantially certain to occur.
However, when Mr. Durocher installed the first set of clips and a roller, he performed the work on a section of the conveyor system that was not elevated, and he was able to do it while standing with his feet firmly on the ground. Plus, during the day and a half immediately preceding Mr. Robinson's accident, the Superior employees were not exclusively chipping rust from the conveyor frame and installing clips, but were also doing other work that did not require them to work in such close proximity to the moving belt. And when they were working on the conveyor system, at least part of that work was done on a section of the frame that was close enough to the ground that they could stand on the ground while performing the work. At the time of his accident, Mr. Robinson was also working near a "pinch-point," which is a particularly dangerous area of the conveyor system, because it is near a roller and can cause the exact type of accident that happened to Mr. Robinson.
These are important distinctions, especially when considering the testimony of Stephen Killingsworth, who emphasized that it was a variety of factors which all contributed to making this accident inevitable. During his testimony at trial, Mr. Killingsworth stated the following:
Now, I understood that Mr. DurocherI'm going to vary a little bitdid one of theseI call it a test clip. He did it while he was standing on the ground. One of the things that makes this accident an absolute that we're going to have an accident happen is that, although Mr. Black or Mr. Durocher was on the ground, he's on a stable platform; he's on the earth. Mr. Robinson was not. He was inand it's a stable platform in this sense is, it's not going to drop; but it doesbecause of the long extension that we've got out here seen in this photograph, it will bounce. You will have movement of that basket just from moving around in the basket your own weight, okay? And it doesn't make it an unstable. It says that if you're working close in work, you've got to be very careful because you can have movement as you're working on this. If I'm chipping with a hammer, I'm moving; I'm putting body movement in, and I'm going to get a bounce on thisin this basket, which means that whenin different positions as I'm chipping, I may be literally bouncing up and down, moving. And it's a slight movement; it's not like this. But I'm going to be moving up and down as I'm chipping which means, if I'm trying to keep away from a moving belt, I may be moving into that belt not because I want to but simply because of the deflection we're going to have in the basket.
So that's the first thing we've got is that we've got Mr. Robinson in a basket, although stable, that will move.
The second thing we've got is that it is a very narrow area.
* * *
But what you're doing now is, Mr. Robinson is now in this basket. We've got a belt that's moving. And he's now going to be asked to take and place his hand up into this area while the belt is moving, okay, as he described yesterday, *107 and to chip and to remove the rust. Well, that says that I've got a fairly narrow area to be able to get my hands up in there.
Now, I examined this, and we're looking at roughly about a twelveeight to twelve inch gap, total gap. That's from the edge of the belt to being able where he's going to chip. And if you look at the hammer, the hammer's going to takejust the point to point on the hammer is going to take up a significant part of that.
So now he's going to be asked to move his hand up above the belt. If he'd been chipping below the belt, it's a little bit better situation. You're still going to have an accident, but we're increasing the probability and we're increasing it and moving it toward that certainty because of the fact that he is not close to the belt; he's above the belt, okay, and trying to keep himself away from the belt.
The third thing we've got that aggravates the situation while he's doing his chipping is that this belt is put together with literally a series of metal clips. You see, in other words, it's not one continuous belt that we slip on like a rubber band. There is a connection where the two portions of the belt are connected together. He was working near the roller. And keep in mind how this is running. It's running down to theit's running down here to the barges and then coming back. So he's going to be coming right across the rollerthere was rollers that he gothe's getting caught on. We've got rollers in the vicinity of him. And when that metal piece comes overand I've got video to show itwhen that metal piece is running overand this is assuming that it's in good condition, as I saw it during my inspection. It was described as being in a disrepair, somewhat of a disrepair at the time he's doing the work on it. But when you see this come over, you will see that the belt will bounce. The belt normally runs pretty true; you don't have much movement up and down. But when it hits that metal when that metal clip hits a roller, you'll see that belt moving.
So now I've got a moving man lift, a moving belt traversing, I've got a belt moving up and down, and I'm trying to chip up above it. That's an accident that is going to happen; it's just a matter of time.
This testimony by Mr. Killingsworth, which was obviously accepted by the jurors, helped them reach the conclusion that these circumstances created more than a reasonable probability that an injury would occur, and that an injury was "inevitable" or "incapable of failing," as required by the definition of "substantial certainty," on which the jurors were properly instructed by the trial court. Unlike in Reeves, the event had not occurred before without injury, because Mr. Robinson was placed into a situation surrounded by dangerous conditions which had not previously existed.
There was also evidence presented that NAS, through its project engineer, Norris Hebert, was aware of the circumstances under which Mr. Robinson was working. Mr. Hebert was in charge of the project and admitted that he had examined the conveyor belt and had discussed with Mr. Durocher how the work would be performed prior to the commencement of the project. Mr. Hebert testified he did not know that a chipping hammer would be used, and that he would not have used one for the purpose of removing rust. He did not say what tool he would have used. Although he denied ever actually seeing Mr. Robinson in the bucket of the man lift *108 using the chipping hammer to chip rust from the conveyor frame, he admitted that he knew the man lift would have to be used for the project and that is the reason NAS supplied the man lift to the Superior employees. Furthermore, Mr. Durocher and Ricky Dotson testified that Norris Hebert made rounds and checked on them on a regular basis to see how the project was progressing and to observe their work. Obviously, the jury discredited the testimony of Norris Hebert, in whole or in part, and instead believed that he, as the project engineer, had knowledge of how the work was going to be performed and that he was aware, through his own observation on his rounds, of the circumstances surrounding Mr. Robinson's accident. Where there is conflict in the testimony, we cannot disturb the reasonable evaluations of credibility and reasonable inferences of fact made by the jury.
Another fact that makes this case stand apart from cases such as Reeves, where none of the employees ever complained about moving the sandblasting pot, is that both Mr. Robinson and Mr. Dotson testified they were very much concerned for their safety and expressed those concerns on numerous occasions to Mr. Durocher, who passed those concerns on to Norris Hebert. Mr. Dotson testified he overheard Mr. Durocher ask Mr. Hebert if they could lock out and tag out the belt in order to clean it and install the clips, and Mr. Hebert refused. Mr. Robinson testified he also overheard that conversation, and although he did not directly hear Mr. Hebert's response, he could tell by Mr. Durocher's reaction that Mr. Hebert had refused to shut down the belt.
Mr. Durocher, on the other hand, denied this and testified that Mr. Robinson and Mr. Dotson did not express any concerns about safety to him and that he did not go to Norris Hebert and ask him to shut down the belt. However, Mr. Durocher did testify he had formed his initial opinion that the work could be performed safely after he had observed the conveyor belt while standing on the ground, and when asked if his opinion had changed after they actually began to do the work, he answered, "somewhat, yes." Since there is a conflict in the testimony, this becomes an issue of credibility, and we will not disturb the jury's determinations regarding the credibility of the witnesses. We can only assume the jury credited the testimony of Mr. Robinson and Mr. Dotson over that of Mr. Durocher and Mr. Hebert and believed that Mr. Robinson and Mr. Dotson were truly concerned for their safety while working in close proximity to the moving conveyor belt, that they expressed those concerns to Mr. Durocher, that in response he asked Mr. Hebert to shut down the belt, and that Mr. Hebert refused to do so.
Furthermore, it is undisputed that the Superior employees did not receive the safety training they were supposed to receive at the salt mine until after Mr. Robinson's accident. Part of the required safety training would have included explaining to them that they had the right to refuse to do any work that they felt uncomfortable doing or that they felt was unsafe. Both Mr. Robinson and Mr. Dotson testified they were concerned about their safety and felt uncomfortable performing the work so close to the moving conveyor belt. However, they had not been informed that they had the right to refuse to do the work.
Based on the credibility determinations made by the jury, which must be afforded great deference, and after reviewing the record in its entirety, we conclude there was a reasonable factual basis for the jury's finding that NAS knew this accident was substantially certain to occur, and the *109 jury did not commit manifest error in finding NAS liable for an intentional act.[2]

Credit for Workers' Compensation Benefits
NAS argues that the trial court committed legal error in refusing to allow it, as Mr. Robinson's statutory employer, a credit for the workers' compensation benefits paid by BICO, the direct employer's insurer. Prior to the jury trial, the trial court ruled that Mr. Robinson would be allowed to present all evidence as to his medical expenses and lost wages and that NAS would receive no credit for the workers' compensation benefits and medical expenses paid by BICO, as BICO was the workers' compensation insurer of Superior and not of NAS. At the same time, the trial court dismissed BICO's claim in intervention against NAS for reimbursement of workers' compensation benefits, but allowed BICO's intervention against the plaintiffs to remain. At some point before trial, BICO settled with all parties and was dismissed from the lawsuit.
During the trial, the parties stipulated that Mr. Robinson had incurred past medical expenses of $107,509.28 and that medical benefits of $103,918.28 and indemnity benefits of $69,637.56, were paid through workers' compensation. The plaintiffs' expert economist, Dr. Roy Womack, testified that Mr. Robinson's past lost wages, based on his income tax returns and the rate of inflation, were approximately $107,569.00.
When the jury returned its verdict, it awarded nothing for Mr. Robinson's past medical expenses and $100,000.00 for his past lost wages. However, on the plaintiffs' motion for JNOV, the trial court awarded past medical expenses of $107,509.28, stating it considered NAS's argument that it should be allowed a credit for workers' compensation benefits to be res judicata, because it had already ruled in pretrial motions that BICO had no claim against NAS for workers' compensation benefits and that NAS was not entitled to a credit for workers' compensation benefits paid by BICO.
NAS argues that this was legal error, and we agree. An employee may not be compensated doubly by workers' compensation benefits and tort damages for the same elements of damages. Double recovery would be in the nature of exemplary or punitive damages, which are not allowable under Louisiana law unless expressly provided by statute. Accordingly, an employer who pays workers' compensation benefits and who is also held liable in tort is entitled to a credit for those items, including past lost wages and medical expenses, that are the same under both obligations in order to avoid double recovery. Gagnard v. Baldridge, 612 So.2d 732, 736 (La.1993).
Although NAS is not the one who actually paid the workers' compensation benefits to the employee in this case, that does not change the fact that Mr. Robinson cannot be compensated twice for the same elements of damages. Accordingly, we must amend the judgment to reflect a reduction for the medical expenses and indemnity benefits which Mr. Robinson was already paid. It was stipulated at trial that Mr. Robinson had incurred past medical expenses of $107,509.28 and that workers' compensation had paid *110 $103,918.28, which leaves $3,591.00 remaining to be paid. The award of past medical expenses will be reduced from $107,509.28 to $3,591.00. It was also stipulated that workers' compensation had paid $69,637.56 in indemnity benefits. The jury award of $100,000.00 in past lost wages will be reduced to $30,362.44.

General Damages
NAS asserts the trial court erred when it partially granted the plaintiffs' motion for JNOV to increase Mr. Robinson's award for past physical and mental pain and suffering from $20,000.00 to $135,000.00 and to increase Michelle Robinson's award for loss of consortium from $10,000.00 to $30,000.00.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by the reviewing court using the same criteria used by the trial court to decide whether to grant the motion. In other words, considering all the evidence in the light most favorable to the party opposing the motion for JNOV, do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If that question can be answered in the affirmative, then the trial court was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion, and the jury verdict should be reinstated. If the appellate court determines that the trial court correctly applied the standard of review as to the jury verdict, then the court reviews the JNOV using the manifest error standard of review. Yohn v. Brandon, 01-1896 (La.App. 1st Cir.9/27/02), 835 So.2d 580, 585, writ denied, 02-2592 (La.12/13/02), 831 So.2d 989.
After reviewing the record, we find the trial court was correct in granting the motion for JNOV, because the awards of $20,000.00 for Mr. Robinson's past physical and mental pain and suffering and $10,000.00 for Michelle Robinson's loss of consortium were abusively low. When this accident occurred, Mr. Robinson's wrist, arm, and shoulder were pulled in between the roller and the conveyor belt and squeezed into a very small area, breaking his wrist, humerus, and scapula and causing massive lacerations and burns across his back and arm. He was raised up into the conveyor to such an extent that his feet were no longer touching anything, and he was dangling. The belt and roller had to be cut in order to remove him. He was immediately taken to the emergency room, where three surgeries were performed to address his broken bones and open wounds. Mr. Robinson was in a great deal of pain and underwent physical therapy for a period of six months, at which time his treating physician determined that he had eighty percent extremity movement, all bones were healed, and he was not taking any medication.
Since that time, Mr. Robinson has moved to Oklahoma, where he has been treated by a chiropractor and several other doctors for continual pain in his shoulder, arm, and back. He has been diagnosed with loss of mobility in the arm, and he has been unable to return to work due to his pain. He has also seen a psychiatrist, who diagnosed him with chronic post-traumatic stress disorder, major depression, and anxiety disorder. Considering the severity of Mr. Robinson's physical injuries and the pain and suffering they have caused him, the psychological impact of the injuries, and the changes to his lifestyle that the injuries have caused him, the trial court was correct in increasing Mr. Robinson's pain and suffering award.
*111 Mr. Robinson's injury has also had a significant impact upon his wife, because she had never worked outside of the home before, but now has been forced to start working in order to support the family. Michelle Robinson no longer gets any help from her husband with chores around the house because of his physical injuries, and she has also had to deal with the changes in their relationship brought on by his constant pain, loss of use of his arm, memory lapses, depression, and episodes of anger during which he screams at family members. The stress from dealing with the changes in her relationship and from becoming her husband's primary caretaker caused Michelle Robinson to have what her doctor called a "major depressive episode," which required treatment from a psychiatrist. Taking all of this into account, the trial court was correct in granting the motion for JNOV with respect to Michelle Robinson's loss of consortium claim.
Having determined that the trial court correctly applied the standard of review as to the jury verdict and correctly granted the JNOV, we must now review the damages it awarded under the appropriate standard of review. Once a trial court has granted a JNOV on the issue of damages and has conducted its own independent assessment of the damages as trier of fact, that decision becomes the judgment of the trial court and is reviewed on appeal for an abuse of discretion. Adams v. Parish of East Baton Rouge, 00-0424, 00-0425, 00-0426, 00-0427 (La.App. 1st Cir.11/14/01), 804 So.2d 679, 699-700, writ denied, 02-0448 (La.4/19/02), 813 So.2d 1090. In reviewing general damage awards, an appellate court must accord much deference to the trial court. The discretion vested in the trial court is great, and even vast, and an appellate court should only disturb an award of general damages if the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-61 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Andrus v. State Farm Mutual Automobile Ins. Co., 95-0801 (La.3/22/96), 670 So.2d 1206, 1210. When reviewed under the foregoing standards, the award of $135,000.00 to Mr. Robinson for past mental and physical pain and suffering and the award of $30,000.00 to Michelle Robinson for loss of consortium do not constitute an abuse of the trial court's discretion.

CONCLUSION
For the foregoing reasons, we amend the judgment of the trial court by reducing the award of past medical expenses from $107,509.28 to $3,591.00, and by reducing the award of past lost wages from $100,000.00 to $30,362.44. In all other respects, we affirm the judgment of the trial court. Costs of this appeal are to be shared equally between appellant and appellees.
AMENDED, AND AS AMENDED, AFFIRMED.
PARRO, J., concurs.
McDONALD, J., dissents and assigns reasons.
McDONALD, J. dissenting.
I respectfully dissent and would reverse the judgment of the trial court. The facts in this case are not distinguishable from those in Reeves v. Structural Preservation *112 Systems, 98-1795 (La.3/12/99), 731 So.2d 208, and thus do not rise to the level of an intentional act. Reeves requires a finding that this result is substantially certain to follow. I agree with the majority that this requires something more than a reasonable probability and necessitates that the outcome be inevitable. However, like Reeves, there is no evidence that this accident was substantially certain to occur. The issue before the court is not what Irving Thomas, Mitchell Gaspard, Felton Davis, or any of the other witnesses thought. The crucial question is what Norris Hebert knew and when he knew it. There is no question that Hebert recognized a risk because he discussed it with Durocher and they agreed that the task could be done safely. There are questions of fact as to what Durocher was told, but there is no dispute that Durocher felt the job could be done safely since he had tried it himself. While the jury was free to believe what they chose about the testimony of Hebert, there was still a legal requirement that Hebert knew that the accident was substantially certain to happen. There is no such evidence. While the expert for the plaintiffs, Stephen Killingsworth testified that it was his opinion that the accident was substantially certain to occur, there was no evidence that Hebert had this knowledge, belief, or opinion. Killingsworth further suggests that his opinion is base on the fact that there was an industry standard rule and federal law requiring locking out and tagging and NAS chose to ignore it. However, the law is clear that the violation of a statute alone is not per se an intentional act sufficient to trigger the exclusion provision. Mott.v. River Parish Maintenance, Inc. 432 So.2d 827, 832 (La.1983). Therefore, since there were no facts to support an essential element to prove an intentional act it was manifest error for the jury to find an intentional act in this case.
For these reasons, I respectfully dissent.
NOTES
[1] Judge Ian W. Claiborne, retired, is serving as judge pro tempore by special assignment of the Louisiana Supreme Court.
[2] In other assignments of error, NAS asserts the trial court erred in denying its motions for summary judgment, for directed verdict, and for judgment notwithstanding the verdict. In those motions, NAS argued that the facts presented did not rise to the level of an intentional act for purposes of the exception to workers' compensation exclusivity. As we are affirming the jury verdict, we find it unnecessary to address those assignments of error.