CHARLES R. JONES, Judge.
hThe appellant, the Association of Community Organizations for Reform Now (ACORN), seeks review of the Louisiana Office of Workers’ Compensation (OWC) judgment, awarding the appellee’s workers’ compensation benefits. We affirm.
The Appellee, Gina Decquir was employed by ACORN as a personal assistant to the director of ACORN. On November 15, 2006, Ms. Decquir was injured while in the course and scope of her employment at ACORN when a shelf fell and hit her while she was sitting at her desk. The shelf required several co-workers to remove it from on top of Ms. Decquir. On the same date, a little more than two hours later, Ms. Decquir saw Dr. Steve Waldo of Ochs-ner Hospital, for her initial walk-in emergency room examination. She complained of both neck and back pain.
However, on or about the day that she was scheduled to return to work on November 20, 2006, she walked into the Ochs-ner Hospital emergency room once again and complained of neck and back pain. She was examined by Dr. Victor Garcia-Prats, who concluded that Ms. Decquir suffered a strain and contusion as well. Dr. Garcia-Prats placed Ms. Decquir on “no work status” for two days.
^Additionally, he specifically noted that Ms. Decquir requested that he provide her with documentation indicating that she be excused from work because, as she indicated to him, she was told that if she did not return to work then she would be fired. After his examination, Dr. Garcia-Prats recommended that Ms. Decquir follow up with her workers’ compensation physician and discharged her in good condition.
*782 On December 4, 2006, Ms. Decquir was seen by Dr. Steven Gurges, who indicated that Ms. Decquir could return to work on December 7, 2006, but specifically restricted her from doing any lifting, pulling, crawling, or squatting. She saw Dr. Gurg-es again on December 18, 2006, at which time he noted that “the patient was given a return to work note for January 23, 2007.”
ACORN authorized and scheduled a January 23, 2007, appointment for Ms. Decquir to see Dr. Daniel Trahant, a neurologist, for an EMG and a nerve conduction study for her subjective complaints of headache, neck and back pain. Prior to that time, Ms. Decquir had not been examined by a neurologist. The results of the EMG and nerve conduction study of her upper extremities were normal. Dr. Tra-hant did not indicate whether Ms. Decquir could return to work, nor did he opine that Ms. Decquir’s subjective complaints of pain rendered her temporarily totally disabled.
However, prior to the end of her treatment, ACORN arbitrarily stopped payment of Ms. Decquir’s benefits. As a result, on January 23, 2007, Ms. Decquir filed a disputed claim for compensation alleging that she was injured on the job while in the course and scope of her employment. She alleged that a shelf fell and hit her while she was sitting at a desk. In the claim she indicated that Dr. Gurges treated her for her work related injuries. Additionally she indicated under section |3“15(c)” of the disputed claim for compensation that no wage benefits were paid and that she sought “[pjenalties and [attorneys [fjees.”
At trial, Ms. Decquir testified that she began working from home on behalf of ACORN performing tasks and assignments consistent with her duties approximately one week after a second visit to the hospital emergency room. She also agreed to continue to receive her regular salary from November 24, 2006 until on or about December 22, 2006. At trial, she did not introduce any additional medical reports or physician’s reports that either opined or established that she was temporarily totally disabled from work after January 23, 2007.
On June 10, 2008, the OWC rendered judgment which: awarded Ms. Decquir indemnity benefits from the date of the accident through October 8, 2007; ordered ACORN to pay Ms. Decquir’s medical bills of $230.00 and $1,280.00; assessed ACORN a $2,000.00 penalty for nonpayment of medical bills; assessed ACORN a $2,000.00 and a penalty for nonpayment of indemnity benefits; awarded attorney’s fees in the amount of $6,000.00; and ordered that all costs of the proceedings be paid by ACORN.
In the instant appeal, ACORN raises the following assignments of error:
1. the trial court was manifestly erroneous or clearly wrong by awarding Ms. Decquir indemnity benefits from the date of the accident through October 8, 2007, because the evidentia-ry record established that she could return to work on January 23, 2007, performing her regular duties; and she testified that she returned to work performing duties consistent with the regular duties on behalf of the employer prior to January 23, 2007?
2. the trial court was manifestly erroneous or clearly wrong by ordering ACORN to pay Ms. Decquir’s medical bills because the court failed to itemize the bills, considering that Ms. Decquir introduced medical records indicating that she received treatment for work and for non-work related conditions.
*783 |43. the district court erred in assessing a penalty against ACORN for nonpayment of indemnity benefits because the evidentiary record established that ACORN paid a claim for performing certain duties during a period that she alleged she was temporarily totally disabled; and because in accordance with La. R.S. 23:1221(l)(b) and (d), Ms. Decquir was not entitled to indemnity benefits.
4. the trial court erred in assessing the penalty against ACORN for nonpayment of medical benefits on the evi-dentiary record which clearly established that ACORN paid for medical services that it believed were related to Ms. Decquir’s work related accident.
DISCUSSION
“In worker’s compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC’s findings of fact is the ‘manifest error-clearly wrong’ standard.” MacFarlane v. Schneider Nat. Bulk Carriers, Inc., 2007-1386, p. 3 (La.App. 4 Cir. 4/30/08), 984 So.2d 185, 188. Additionally,
[ T]he findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. Alexander, 630 So.2d at 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Robinson v. North American Salt Co., 02-1869 (La.App. 1 Cir.2003), 865 So.2d 98, 105. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Robinson, 865 So.2d at 105. The determination of whether injury occurred in the course and scope of employment is a mixed question of law and fact. Winkler v. Wadleigh Offshore, Inc., 01-1833 (La.App. 4 Cir. 4/24/02), 817 So.2d 313, 316 (citing Wright v. Skate Country, Inc., 98-0217 (La.App. 4 Cir. 5/12/99), 734 So.2d 874).
Dean v. Southmark Construction, 2003-1051, p. 7 (La.7/6/04), 879 So.2d 112, 117.
IsLouisiana Revised Statute 23:1221, Temporary total disability; permanent total disability; supplemental earnings benefits; permanent partial disability; schedule of payments, provides in pertinent part:
Compensation shall be paid under this Chapter in accordance with the following schedule of payments:
(1) Temporary total.
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) For purposes of Subparagraph (l)(a) of this Paragraph, compensation for temporary disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain.
*784 (c) For purposes of Subparagraph (l)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subpar-agraph (l)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
(d) An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a | (¡reasonably reliable determination of the extent of disability of the employee may be made and the employee’s physical condition has improved to the point that continued, regular treatment by a physician is not required.
Hence, as set forth in the statute above, a claimant who seeks workers’ compensation benefits on the basis that he is temporarily totally disabled must prove by clear and convincing evidence, without taking pain into consideration, that he is unable to engage in any employment or self-employment. “To prove a matter by ‘clear and convincing’ evidence means to demonstrate that the existence of a disputed fact is much more probable than its nonexistence.” Molinere v. Vinson Guard Service, Inc., 2005-0116, p. 5 (La.App. 4 Cir. 7/13/05), 914 So.2d 566, 571, citing Louisiana State Bar Ass’n v. Edwins, 329 So.2d 437 (La.1976). Under Louisiana law, “[T]he question of disability must be determined by reference to the totality of the evidence, including both lay and medical testimony.” Hosli v. Rent-A-Center, Inc., 2006-1466, p. 8 (La.App. 4 Cir. 4/11/07), 957 So.2d 207, 212, citing Dugas v. Rosary House, 93-42 (La.App. 3 Cir. 4/6/94); 635 So.2d 570, 572.
In the instant matter, ACORN asserts that Ms. Decquir presented the medical records from Ochsner Hospital, particularly those records from her visits with Dr. Gurges, whom she named as the physician who treated her for her work related injuries. Dr. Gurges indicated that Ms. Dec-quir could return to work on December 7th, provided that she not do any lifting, pulling, crawling, or squatting. ACORN also notes that Dr. Gurges indicated that Ms. Decquir had a good range of motion and that she had no edema in her extremities.
Dr. Gurges saw Ms. Decquir again on December 18, 2006. At that time, he provided her with a doctor’s note so that she could return to work on January 23, |72007 and he recommended a referral to a neurologist and ACORN approved the visit with the neurologist.
Ms. Decquir also testified her appointment with the neurologist was scheduled for January 23, 2007, with Dr. Trahant for her subjective complaints of pain in her upper extremities. At that time, she underwent an EMG and a nerve conduction study of her upper extremities. The results were: “(1) normal EMG of upper extremities; no evidence of motor root impingement or other neuropathic or myo-pathic process”; and “(2) Normal nerve conduction study of upper extremities. There [was] no evidence of entrapment neuropathy or peripheral polyneuropathy affecting upper extremities.”
Following the January 23, 2007 office visit, Ms. Decquir testified that she was scheduled to return to work without any *785 restrictions after being seen by Dr. Tra-hant. However, due to continued pain and discomfort, she did not return to work on January 23, 2007, as anticipated; rather, she filed a disputed claim for compensation benefits.
ACORN also asserts that January 23, 2007, was not the first time Ms. Decquir saw a physician for her injuries; rather asserts that Ms. Decquir sought treatment on November 15, 2006, the day of the accident, in the emergency room. ACORN noted that after this particular examination, the emergency room physician told Ms. Decquir that she could return to work in two days. However, rather than return to work on November 22, 2006, she returned to the emergency room complaining of neck, back and headache pain, and reported that she needed to return to work on the following day, or she would be replaced and she also requested a written work excuse note from the emergency room physician.
Is ACORN notes, however, that Ms. Dec-quir was released by the attending emergency room physician in good condition, and that there is no indication from the medical records that she was determined to be temporarily totally disabled.
Additionally, ACORN contends that Ms. Decquir’s own testimony that she was allowed to work from home by her employer supports their contention that she failed to meet her evidentiary burden of proof. It refers to the following colloquy in particular:
Q: So you went to back to the emergency room on November 20; is that correct?
A: That may be right.
Q: And that was the emergency room?
A: Right.
Q: And you let your employer know that you were not feeling well, and you did not feel like you could actually go into work; is that correct?
A: Right.
Q: Did you go back to work at some point, or did you continue—
A: I had the — he—I have the computer at home. I used to take that — they had gotten a personal computer, a laptop, that they had purchased for somebody else.
And the next week — because they had given me some different medicine. I told them that I was going to work on the banquet at home, because I didn’t have to be up all day. So that week, I want to say worked on it Monday, Tuesday.
And he called me, maybe Wednesday, and told me not to work on it if I wasn’t feeling well, I needed to rest, to bring the computer back.
So—
|¡)Q: So you actually had a computer from ACORN at your home?
A: Right. They gave it to me that first week. And I had been bringing it home every day.
THE COURT: Wasn’t there an allegation that she was disabled from work?
MS. VINET:[1] Well, that could be an argument. But I’m asking questions about what she did.
BY MS. VINET:
Q: So even though you were feeling-bad and you have these migraines that had come on even worse, you were going to still try to help them with that project?
A: Because all the paperwork — well, when people — Because it was most *786 ly like getting the menu and all together.
And I would write it down. And the people would call in. So I was trying to put it on the spreadsheet for them.
Q: So the purpose of continuing to work was what?
A: Because I thought that I would be going back to work. I didn’t think that it would be drawn out that— This long.
ACORN argues that considering the above testimony, Ms. Decquir should not be entitled to benefits because she worked at home. It particularly asserts that section La. R.S. § 1221(b) provides:
For purposes of Subparagraph (l)(a) of this Paragraph, compensation for temporary disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain.
| mACORN further contends that Ms. Decquir was not entitled to indemnity benefits since the results of the EMG and nerve conduction study administered by Dr. Trahant were normal, and she was released to work without restrictions. It noted that although she complained of headaches for one to two months, she was scheduled to return to work without restriction on January 23, 2007. ACORN also asserts that at the time she was discharged by Drs. Trahant and Gergus, neither doctor recommended further treatment for her work-related injuries. However, ACORN unequivocally acknowledged that Ms. Decquir was recommended for physical therapy.
Essentially, ACORN contends that Ms. Decquir’s ability to physically engage in some form of employment prior to January 23, 2007, and thereafter, is conclusive proof that Ms. Decquir has failed to establish by clear and convincing evidence that she was physically unable to engage in employment or self-employment.
ACORN also asserts that Ms. Decquir’s physical ability also establishes that the OWC erred in assessing a $2,000.00 penalty against it for failure to pay Ms. Decquir indemnity benefits. ACORN argues that the record establishes that Ms. Decquir worked for her employer after her work-related injury and that she performed duties that were consistent with her normal duties during a time that she was temporarily and totally disabled, as ACORN asserts supported by the following colloquy:
Q: Is it your contention that while at home you actually worked for ACORN to earn $2,000.00
A: The first week I was out?
Q: Yes.
| nA: The first week I continued to help with that banquet they were having, until they asked me for the computer back.
Q: Was that consistent with your duties as a Chief Organizer Assistant?
A: Yes it was.
Q: So you were able to perform your duties?
A: I only did it two days, three days.
Q: But you were able to perform your duties?
A: Okay.
ACORN argues that La. R.S. § 1221(b) also applies with respect to the penalty assessed in Ms. Decquir’s favor because the statute specifically prohibits any type employment or self-employment while temporarily and totally disabled.
*787 Ms. Decquir asserts that the OWC did not err in concluding that she was entitled to temporary and total disability benefits, pursuant to La. R.S. § 23:1221(c), which provides:
For purposes of Subparagraph (l)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subpar-agraph (l)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
Ms. Decquir argues that in order for her to have prevailed at the workers’ compensation hearing under La. R.S. § 23:1221(c), she had to prove by clear and | ^convincing evidence that: (1) an injury was sustained during the course and scope of employment; (2) that the she was disabled; and (3) there was a causal connection between her disability and the employment related injury. She asserts that she was clearly injured on the job when: the shelf fell on her head and pinned her to her desk; she suffered injuries as a result of the shelf falling on her; and that there is a causal connection between her disability and her employment-related injury as she was injured during the course and scope of her employment.
She asserts that she worked as a personal assistant to the director of ACORN, and she was injured on the job when a shelf fell on her and pinned her to her desk. She notes that it took five co-workers to remove the shelf off of her. Immediately following the accident, she experienced a throbbing headache accompanied by knots on her head.
Ms. Decquir asserts that she sought treatment at the Ochsner Hospital emergency room complaining of neck and head pain. She was treated by Dr. Steve Waldo, who determined that she had a cervical strain and contusion. Dr. Waldo also instructed her to stay home from work for two (2) days. However, she indicated that after two days, she was still unable to return to work. Instead, she went back to the hospital and reported that she had been bedridden for two days and that she had difficulty eating and getting out of the bed.
She was then treated by Dr. Garcia-Prats at Ochsner Hospital. Dr. Gareia-Prats noted that she had suffered a strained neck with contusions to her head and he instructed her to follow up with her workers’ compensation physician.
Ms. Decquir saw Dr. Gurges for headaches. She notes that while Dr. Gerges indicated that she could return to work on December 7, 2006, he specifically | ^forbade her from lifting, pulling, crawling, or squatting. However, when December 7th came, Ms. Decquir asserts that she was unable to return to work.
Ms. Decquir saw Dr. Gurges again on December 18, 2006. At that time, he told her that she should be able to return to work on January 23, 2007, but that she should consult a neurologist for an EMG and a nerve conduction study for her headaches, neck and back pain. He subsequently released her with instructions to attend physical therapy and for her to have the physical therapist to determine when she could return to work.
*788 She asserts that on January 23, 2007, ACORN scheduled a visit for her to see Dr. Daniel Trahant, a neurologist, who noted during his examination of her that Ms. Decquir reported continuous pain from her cervical area radiating to her shoulders, pain in both arms, and par-esthesia of the left arm Ms. Decquir also complained of upper back pain. The EMG and nerve conduction tests were normal.
Ms. Decquir asserts that she received physical therapy until April 29, 2007, at which time she was forced to discontinue her treatment because ACORN stopped paying for her medical bills. She asserts that she was still in pain and in need of the physical therapy sessions. In addition, she points out that over the next six months, she returned to Ochsner Hospital for trigger point injections in her neck. Her last injection was received in October 2007.
Ms. Decquir argues that at trial, she submitted her complete medical records from Ochsner Hospital. She also testified about the accident and her treatment. She also asserts that she testified that the OWC failed to pay her indemnity despite her documented inability to work; how ACORN failed to pay her medical bills; | Hand how she provided ACORN all documents they requested, but that she was stonewalled in her efforts to get her medical treatment paid.
Ms. Decquir, citing the Supreme Court case of, Hatcher v. Diebold, 2003-3263 (La.5/15/01), 784 So.2d 1284, argues that she had met the clear and convincing evidence standard in proving her claim and she further asserts that “the clear and convincing standard in a worker’s compensation case is an ‘intermediate standard falling somewhere between the ordinary ‘preponderance of the evidence’ civil standard and the beyond a reasonable doubt criminal standard,” Id., p. 4 784 So.2d at 1288.
Ms. Decquir asserts that the OWC judge had the benefit of viewing her medical records, her testimony, as well as the reports of each physician who treated her. Ms. Decquir also testified at trial that she experienced pain throughout the eleven-month period from the day she sustained the injuries until her last trigger point injection in October 2007. She also testified that immediately following the accident, she suffered migraines,[2] was bedridden, and that she was unable to care for her child.
At trial she also testified that she underwent medical testing which prompted her treating physician to prescribe physical therapy from November 2007 through April 2008. Ms. Decquir specifically noted that it was her physical therapist who told her that she would not be able to immediately return to work. However, she later determined that her physical therapy would not continue because she was told that ACORN had arbitrarily discontinued paying her medical bills. Although she continued to receive trigger point injections in her neck for pain from July 2007, | ^through October 2007, it was her private medical insurance that provided for the trigger point injections, not ACORN.
Ms. Decquir also argues that the medical records from Dr. Kaufman indicate that in July, 2007, Ms. Decquir complained that her pain was 10/10, the highest register on a pain scale. She was diagnosed with chronic neck pain, cervicalgia, muscle spasms and myalgia at the upper right trapezius and paracervical. The following month, she was given trigger point injections due to her diagnoses of chronic neck pain, myofascial pain, and muscle spasms. By October 2007, she was prescribed trig *789 ger point injections and vicodin for her pain.
Our review of the record indicates that based upon the testimony and evidence Ms. Deequir presented at trial, the OWC judge specifically noted that Ms. Decquir’s testimony was credible, and that she was entitled to indemnity benefits from the date of the accident until October 8, 2007, which was the last day she received trigger injections. Although ACORN was given credit for benefits that it had already paid to Ms. Deequir, the judge found that ACORN had no basis to deny her benefits or to deny payment of her medical bills. As a result, she was awarded penalties of $2,000.00, for nonpayment of indemnity benefits, $2,000.00, for non-payment of medical bills, and $6,000.00 in attorney fees.
The record before us supports her claim that she was unable to work from November 2006 until October 2007. In addition, the record also supports her allegation that ACORN arbitrarily refused to pay for her medical treatment while she was still engaged in active physical therapy treatments directly related to the injury she sustained while engaged in the course and scope of her employment at ACORN. Ms. Decquir’s medical records also support the OWC judge’s findings | mthat she was entitled to workers’ compensation benefits, Hence, we find this assignment of error is without merit.
In its second assignment of error, ACORN asserts that the OWC erred in ordering it to pay Ms. Decquir’s medical bills because the court failed to itemize the bills considering that Ms. Deequir introduced medical records indicating she received treatment for work and non work-related injuries.
Although ACORN has listed this particular assignment of error, it provides a recitation of the statute and the cases reiterating the standard of review, but cites no case law in support of its argument. ACORN asserts that because Ms. Dec-quir’s condition improved in such a manner that regular treatment was no longer required by a physician, it was not required to pay for her medical expenses. Further, it asserts that Ms. Decquir’s subjective complaints of pain do not support a finding that she was physically unable to engage in some form of employment thereby requiring ACORN to pay for her additional medical expenses, because: (1) Ms. Dec-quir was scheduled and was able to return to work on January 23, 2007, performing her regular duties without any restrictions, and that she was able to do so with physical therapy for her subjective complaints of pain; and (2) that she was capable of working and resumed working for her employer about one week after November 20, 2006, and receive compensation at least until December 22, 2006.
However, while ACORN stresses that Ms. Deequir was “scheduled” to return to work, it also acknowledges that she was still engaged in physical therapy. ACORN, per our review of the record, purportedly stopped paying for Ms. Dec-quir’s therapy on the basis that a tentative date to return to work was set by her treating physician, Dr. Gurges in his December 18, 2006 medical report. ACORN subsequently authorized and paid for Dr. Gurges’ referral of Ms. Deequir to Dr. 1]7Trahant, a neurologist, to conduct an EMG and a nerve conduction study. However, following receipt of the results of the EMG and nerve conduction study, Dr. Gurges discharged Ms. Deequir from his respective care, but made a specific recommendation that she continue physical therapy. At this time, ACORN made the unilateral decision to stop payment.
*790 Ms. Decquir argues that penalties and attorney’s fees under La. R.S. 23:1201(F) are recoverable if the employer fails to commence payments of benefits timely or to pay continued installments or medical benefits unless the claim is reasonably controverted. She further asserts that in order to escape liability for its failure to provide benefits or medical treatment, an employer must adequately investigate the claim, and the crucial inquiry is whether the employer had an articulable and objective reason for denying or discontinuing the benefits or medical treatment.
Louisiana Revised Statutes Annotated 23:1201(F), titled Time and place of payment; failure to pay timely; failure to authorize; penalties and attorney fees provides in pertinent part:
F. Failure to provide payment in accordance with this Section or failure to consent to the employee’s request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might | isbe imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:
(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers’ compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers’ compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.
(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.
(3) Except as provided in Paragraph (4) of this Subsection, any additional compensation paid by the employer or insurer pursuant to this Section shall be paid directly to the employee.
(4) In the event that the health care provider prevails on a claim for payment of his fee, penalties as provided in this Section and reasonable attorney fees based upon actual hours worked may be awarded and paid directly to the health care provider. This Subsection shall not be construed to provide for recovery of more than one penalty or attorney fee.
(5) No amount paid as a penalty or attorney fee under this Subsection shall be included in any formula utilized to establish premium rates for workers’ compensation insurance.
*791 | 19Ms. Decquir asserts that in the instant matter, ACORN failed to establish facts to controvert her claim. She maintains that ACORN failed to “adequately investigate the claim, it failed to authorize benefits, and failed to authorize medical treatment. In addition she notes that ACORN failed to present any witnesses, evidence — documents or medical — in support of its corn tention that she was not entitled to benefits and medical payments. Ms. Decquir also argues that ACORN also failed to provide any reason why it ceased to pay for Ms. Decquir’s benefits and medical payments. Ms. Decquir points out that ACORN’s representative, Mr. Matthew Brennan Griffin, even testified that he never reviewed Ms. Decquirs’ medical records.
Our review of the record indicates that ACORN clearly did not fulfill its obligation to furnish the medical evaluations and treatment which became necessary after Ms. Decquir was injured on the job. Ms. Decquir, despite ACORN’s cessation of medical payments, continued her treatment using her own personal health insurance and paid out of pocket for her trigger point injections. We find this assignment of error is without merit due to ACORN’s failure to fulfill its statutory obligation to pay for Ms. Decquir’s medical treatment.
In its third assignment of error, ACORN argues that the OWC erred in awarding Ms. Decquir indemnity benefits beyond January 23, 2007, because, as asserted by ACORN, a reasonable determination could be made that Ms. Decquir’s physical condition had resolved and she had been cleared to return to work.
Ms. Decquir asserts that since ACORN failed to provide medical treatment and also failed to pay her temporary total benefits, the OWC properly awarded her penalties and attorney’s fees.
12oGiven that ACORN has acknowledged that Ms. Decquir was still in active physical therapy, and further considering that the Court has determined that the OWC was not manifestly erroneous in finding that Ms. Decquir was a credible witness and that she was entitled to benefits, this assignment of error is without merit.
In its final assignment of error, ACORN argues that the OWC court “erred in assessing a penalty for non-payment of medical benefits when the evidentiary record established that ACORN paid for medical services it believed were related to Ms. Deequir’s work related accident.”
This Court has reviewed the record in its entirety and has found that the OWC judge was not manifestly erroneous, nor clearly wrong when it determined that ACORN breached its statutory duty with respect to paying for medical treatment directly resulting from a work-related injury. We have also reiterated that ACORN acknowledged that Ms. Decquir was still in active physical therapy, but that it only paid for treatment it believed was related to her work-related injury. However, ACORN’s subjective beliefs as to whether Ms. Decquir’s injuries resolved contradict Dr. Gurges’s recommendation that Ms. Decquir continue physical therapy. Furthermore, the statute does not require an employer’s subjective belief that an employee is physically incapacitated in order for the benefits to inure; rather, the statutory duty is imposed as a result of the employee’s work-related injury.
Louisiana Revised Statute 23:1201(F) expressly provides that “[fjailure to provide payment in accordance with this Section ... shall result in the assessment of a penalty.” Accordingly, since we have determined earlier in our discussion of the matter sub judice that the OWC was not manifestly erroneous in finding that Ms. | ¾1 Decquir was a credible witness and that she was entitled to benefits, we find that *792 the OWC did not err in assessing a penalty due to ACORN’s arbitrary non-payment of Ms. Decquir’s medical payments as required pursuant to La. R.S. 23:1201(F).

DECREE

For the foregoing reasons, the judgment of the Office of Workers’ Compensation is affirmed.
AFFIRMED.

. Counsel for Ms. Decquir.

. She testified that the headaches where so severe that her “head felt like exploding.”