STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-1534


RAGLE CELESTINE

VERSUS

FIRESTONE POLYMERS, L.L.C.


************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 03
PARISH OF CALCASIEU, NO. 08-01995
HONORABLE CHARLOTTE L. BUSHNELL
WORKERS' COMPENSATION JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Jimmie C. Peters, Marc T. Amy, and J. David Painter, Judges.


**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**

Mark Zimmerman
Attorney at Law
4216 Lake Street
Lake Charles, LA 70605
(337) 474-1644
COUNSEL FOR PLAINTIFF/APPELLEE:
    Ragle Celestine

B. Scott Cowart
Taylor, Wellons, Politz & Duhe, APLC
7924 Wrenwood Boulevard, Suite C
Baton Rouge, LA 70809
(225) 387-9888
COUNSEL FOR DEFENDANT/APPELLANT:
    Firestone Polymers, L.L.C.

PETERS, J.

The defendant, Firestone Polymers, LLC (Firestone), appeals from the judgment of the workers' compensation judge (WCJ) finding that the plaintiff, Ragle Celestine, suffered a work-related accident while employed by Firestone and that he was temporarily and totally disabled as a result of that injury. Mr. Celestine answered the appeal, seeking reversal of the WCJ's denial of his claim for penalties and attorney fees and seeking an additional award on appeal. For the following reasons, we affirm in part, reverse in part, and render.

## DISCUSSION OF THE RECORD

Mr. Celestine was a forty-one-year employee with Firestone on December 27, 2006, when he underwent surgery to remove cancerous lesions and ultimately a portion of his colon and his gall bladder. At the time of his surgery, he held the position of A-2 computer operator. On March 5, 2007, Dr. Thomas H. McCalla, the Lake Charles, Louisiana surgeon who performed the surgery, released Mr. Celestine to return to work. However, he did not immediately return to work because Firestone requires any employee who misses work after undergoing a surgical procedure to undergo physical testing with a rehabilitation facility to determine his or her fit-for-duty status.[1]

Mr. Celestine underwent the required physical testing on March 7, 2007, under the supervision of Kristina Lounsberry, a physical therapist and co-owner of Industrial Strength Work Rehabilitation Center in Sulphur, Louisiana. The testing itself is job specific[2] and, in the case of Mr. Celestine, included a series of four lifts

---

[1]This fit-for-duty testing is part of the Pension, Insurance, and Savings Plan Agreement between Firestone and the Lake Charles Metal Trade Council, AFL-CIO, which provides benefits to employees suffering non-work related accidents or illnesses.

[2]Scott Lounsberry, a co-owner of the testing facility, testified concerning the physical demands associated with the A-2 computer operator position. His testimony will be discussed later

of a weighted box: 1) shoulder height to overhead, 2) knuckle to shoulder height, 3) floor to knuckle height, and 4) twelve inches to knuckle height. Mr. Celestine asserts that the injuries which give rise to this litigation occurred during the lifting process.

According to Mr. Celestine, he felt a pulling sensation in his abdomen and discomfort in the area of his incision while performing the lifting tests. Despite these complaints, he completed the testing procedure and was cleared to return to work. He returned to work on March 8, 2007. However, the soreness experienced during the fit-for-work testing persisted, and at a March 13, 2007 office visit, he related that complaint to Dr. McCalla. A few days later, on March 16, 2007, he related a similar complaint to Dr. Van Snider, his primary care physician and a Lake Charles, Louisiana internist. However, he also complained to Dr. Snider of lower back pain, the origin of which he related to the March 7, 2007 fit-for-duty test. Mr. Celestine continued working until August of 2007.

On August 28, 2007, he was diagnosed by Dr. McCalla as having a ventral hernia located on the upper incision from his prior colon resection. Dr. McCalla surgically repaired the hernia on October 11, 2007, and, on January 15, 2008, released Mr. Celestine to return to work.

What occurred next is contested by the parties. Firestone alleges that Mr. Celestine refused to undergo the required fit-for-duty test based on a fear of reinjury. Mr. Celestine claimed that he was ready to return to work, but was prevented from doing so by Firestone. Nevertheless, Mr. Celestine never performed the required test nor did he return to work. After investigating his claim, Gallagher Bassett Services (Gallagher Bassett), Firestone's workers' compensation administrator, denied Mr.

---

in the opinion.

Celestine's claim for benefits on January 16, 2008. On February 28, 2008, Mr. Celestine filed a disputed claim for compensation seeking indemnity benefits, medical treatment, and penalties and attorney fees based on Firestone's failure to reasonably controvert his claim. After attempts to correspond and meet with Mr. Celestine failed, Firestone terminated his employment effective June 11, 2008. Firestone did so based on Mr. Celestine's unexcused absences.[3]

Following a trial on the merits, the WCJ rendered oral reasons finding that Mr. Celestine satisfactorily proved that he suffered a work-related injury while undergoing the fit-for-duty testing and that he was entitled to indemnity benefits. However, the WCJ also found that the matter was reasonably controverted by Firestone and denied Mr. Celestine's request for penalties and attorney fees. A subsequent judgment was rendered in accordance with these findings.

Firestone has appealed suspensively from this judgment, raising two assignments of error:

1. The trial court manifestly erred in finding that Celestine carried his burden of proving an accident causing a hernia and back injury during the March 7, 2007 fit-for-duty test.

2. The trial court manifestly erred in finding that Celestine carried his burden of proving he was disabled from his A-2 Operator job after January 15, 2008.

Mr. Celestine has answered Firestone's appeal, requesting that:

1. The judgment appealed from be amended and modified to include an award of penalties and attorney fees.

2. Attorney fees be awarded for work done on this appeal.

---

[3]The Pension, Insurance, and Savings Plan Agreement requires an employee absent from work as a result of a non-occupational accident or illness to periodically provide it with an Accident/Sickness Status Form signed by the treating physician. Failure to do so causes the absences to be considered unexcused and grounds for termination of employment.

3. The appellant be condemned to pay all costs.

4. The judgment be affirmed in all other respects.

## OPINION

### *Firestone's Appeal*

It is well settled that the standard of review applied in workers' compensation cases is the "manifest error-clearly wrong" standard. *Dean v. Southmark Constr.*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117.

> Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander* [*v. Pellerin Marble & Granite*, 93-1698 (La. 1/14/94)], 630 So.2d [706,] 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Robinson v. North American Salt Co.*, 02-1869 (La.App. 1 Cir.2003), 865 So.2d 98, 105. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Robinson*, 865 So.2d at 105. The determination of whether injury occurred in the course and scope of employment is a mixed question of law and fact. *Winkler v. Wadleigh Offshore, Inc.*, 01-1833 (La.App. 4 Cir. 4/24/02), 817 So.2d 313, 316 (citing *Wright v. Skate Country, Inc.*, 98-0217 (La.App. 4 Cir. 5/12/99), 734 So.2d 874).

*Id.*

Louisiana Revised Statutes 23:1021(1) defines an "accident" as an "unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." In order to secure workers' compensation benefits, the employee must prove the existence of a work-related accident and that the accident is causally related to the complained of disability. *Dousay v. Dousay Floor Covering*, 07-195 (La.App. 3 Cir. 9/12/07), 966 So.2d 677, *writ denied*, 07-2023 (La. 12/7/07), 969 So.2d 639.

Proof is by a preponderance of the evidence. *Bruno v. Harbert Int'l Inc.*, 593 So.2d 357 (La.1992). Thus, if the probability of causation is equally balanced based on the evidence presented, then the employee has not carried his burden of proof. *Guilbeaux v. Office of Dist. Attorney*, 07-89 (La.App. 3 Cir. 5/30/07), 957 So.2d 959.

> A worker's testimony alone may be sufficient to discharge this burden of proof, provided two elements are satisfied: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged incident. *West v. Bayou Vista Manor Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, *13 Louisiana Civil Law Treatise, Workers' Compensation*, § 253 (2d Ed.1980). Corroboration of the worker's testimony may be provided by testimony of fellow workers, spouses or friends. Malone and Johnson, supra; *Nelson [v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991)]. Corroboration may also be provided by medical evidence. *West, supra.*
>
> In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of this testimony." *West*, 371 So.2d at 1147; *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987).

*Bruno*, 593 So.2d at 361.

With regard to disability, an employee's disability is presumed to have been caused by an accident if, before the accident, the employee was in good health but, commencing with the accident, the symptoms of the disabling condition appeared and continuously manifested themselves, provided that the medical evidence establishes a reasonable possibility of a causal connection between the accident and the disabling condition. *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979). In fact, "[o]nce the disabled employee establishes the presumption of a causal relationship, the party denying the existence of the presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue." *Walton v. Normandy Vill. Homes Ass'n, Inc.*, 475 So.2d 320, 325 (La.1985).

5

> In order to prove entitlement to temporary total disability benefits or to permanent total disability benefits, a claimant must demonstrate by clear and convincing evidence that he is physically unable to engage in any employment, including working while in any pain. La.R.S. 23:1221(1)(c) and (2)(c). Disability is a question of fact. *Jones v. Universal Fabricators*, 99-1370 (La.App. 3 Cir. 2/9/00), 758 So.2d 856, *writ denied*, 00-742 (La.5/12/00), 762 So .2d 13.

*Gibson v. Shaw Global Energy Servs.*, 04-547, p. 6 (La.App. 3 Cir. 10/27/04), 885 So.2d 707, 712, *writ denied*, 04-2920 (La. 2/4/05), 893 So.2d 876.

The findings of a workers' compensation judge pertaining to the burden of proof and witness credibility are factual in nature and will not be reversed on appeal absent manifest error. *Id.*

Mr. Celestine testified that as he was picking weight up off the floor, he felt pain across his stomach and down into his leg. He immediately retrieved a velcro belt to wear around his stomach for the remainder of the test, but after the testing resumed, he could not bend his legs due to pain. According to Mr. Celestine, he informed Mrs. Lounsberry that he hurt all over, but she did not respond and continued the testing. Mr. Celestine testified that, at the conclusion of the test, his stomach, back, and legs hurt and when Ms. Lounsberry gave him a slip to take to his doctor, he went home and slept instead. When Dr. McCalla's March 13, 2007 examination failed to detect a hernia, the doctor asked him if he wished to return to work and he responded in the affirmative. However, when he saw Dr. Snider a few days later, his stomach was still hurting and swollen.

Mrs. Lounsberry testified that Mr. Celestine never complained during the testing process that he had suffered an injury. However, she acknowledged that he complained of a slight pulling in the abdomen area, and he expressed a concern about reinjuring himself. She reported this complaint as well as his hesitancy about being able to perform lifting as a part of his duties. She also acknowledged that although

6

Mr. Celestine was able to lift twenty-five pounds from the floor to knuckle height, she stopped the testing at that level due to Mr. Celestine's loss of body mechanics. She stopped the fourth lift at the same level for the same reason—Mr. Celestine's loss of body mechanics. In fact, at this point she terminated the lifting portion of the testing and turned to the requirement that he walk one hundred yards. At the end of all the testing, she signed off on the evaluation, concluding that he suffered no after effects from the testing procedure.

According to Mr. Celestine, after he returned to work, he continued experiencing pain and swelling in his stomach, pain in his lower back and groin, and difficulty in walking and sitting for periods of time. It was not until he returned to Dr. McCalla in August of 2007, that a hernia was discovered. He testified that at the time of trial, he was still experiencing pain in his lower back as well as his leg. According to Mr. Celestine, the leg pain was accompanied by pulsing, electric-like symptoms, he could not bend and stoop without serious pain, and his back pain was made worse by sitting for long periods of time. Not only did he feel he could not lift a box of paper, but a simple task such as mowing his lawn caused his back to hurt.

When asked specifically about the condition of his back, Mr. Celestine denied a history of back pain close in time to the performance of the fit-for-duty test. He acknowledged bouts of back pain in the distant past, but testified that the first time that pain was accompanied with pain down the leg was after the fit-for-duty test. When asked if he suffered any illnesses between March and October of 2007, Mr. Celestine stated that he took off one day from work to see the doctor about his abdominal pain. He also testified that during that time, he suffered from a chronic consistent cough. Each time he coughed or sneezed, he suffered pain in his abdomen.

7

Dr. McCalla confirmed that Mr. Celestine complained of pain while lifting at the March 13, 2007 office visit, but also acknowledged that he found no evidence of infection or a hernia at the incision site. Because of his lack of findings, he initially maintained his opinion that Mr. Celestine could return to work. However, when Mr. Celestine returned for an office visit on August 28, 2007, Dr. McCalla found definite evidence of a hernia in the upper incision from his colon surgery, which he surgically repaired on October 11, 2007.

Dr. McCalla testified that he could not say with absolute certainty that the hernia originated with the fit-for-duty testing on March 7, 2007, but because nothing else in Mr. Celestine's history suggested another cause, he concluded that it was reasonable that Mr. Celestine's hernia developed at that time. He explained that a hernia begins small and becomes larger over time and this was the explanation for why he did not find it on March 13, 2007. Not only were Mr. Celestine's symptoms at that time consistent with the hernia being present, but it developed when the tough fascias (skin) failed to heal at the incision following his surgery and pulled apart—a fact consistent with the complaints during the testing.

Because Dr. McCalla's treatment of Mr. Celestine related only to the hernia complaints, he presented no testimony concerning a back injury. In fact, he had no record of Mr. Celestine complaining of difficulty with his back, and Dr. Snider was the first physician to whom Mr. Celestine complained of this portion of the injury.

Dr. Snider testified that Mr. Celestine complaints of lower back pain accompanied his complaints of abdominal muscle soreness at the March 16, 2007 visit. These same complaints were echoed at the March 20, 2007 visit and remained consistent through the August 2007 hernia repair surgery. Thereafter, Mr. Celestine's

complaints began to be exclusively about his back pain. On October 29, 2007, Mr. Celestine complained to Dr. Snider of right, front-to-back pain, and pressure above his right thigh. These complaints and their March 7, 2007 origin were consistent through the November 5 and 28, 2007 visits. By the time of the December 12, 2007 office visit, Mr. Celestine had begun to complain of increased numbness in his right leg. When an MRI performed that day revealed multi-level degenerative changes in the lumbar spine including a small herniated disc with some annular tearing at L4-5, which was slightly causing a displacement of the L4 nerve root, Dr. Snider referred Mr. Celestine to Dr. Gregory J. Rubino, a Lake Charles neurosurgeon.

In summarizing his treatment, Dr. Snider testified that Mr. Celestine's lower back complaints on March 16, 2007, were consistent with the findings of the December 2007 MRI. In other words, what had begun as general complaints of lower back pain had worsened into pain more indicative of a herniated disc, which the MRI revealed. While generally deferring to Dr. Rubino concerning causation, he opined that it would be reasonable to conclude that the fit-for-duty test caused either the aggravation or hastening of Mr. Celestine's back condition. He suggested that Mr. Celestine should not perform the lifting and bending portion of the fit-for-duty test and that he would restrict him from lifting more than three to five pounds.

When Dr. Rubino first saw Mr. Celestine on December 21, 2007, Mr. Celestine complained of lower back pain after straining his back during the return-to-work test. Mr. Celestine further reported to the doctor that he had been unable to bend his knees due to pain during the lifting part of the test and that he compensated for the pain by lifting straight-legged. Based on the nine-month history of low back pain, Dr. Rubino recommended physical therapy.

9

Mr. Celestine's pain persisted with limited relief from the physical therapy and, on February 28, 2008, Dr. Rubino ordered a thoracic MRI and recommended that Mr. Celestine undergo lumbar epidural steroid injections for the treatment of his leg pain. By the next visit on April 7, 2008, Mr. Celestine had enjoyed a few days of excellent pain relief following the injection. At that time however, the thoracic MRI revealed a small left-sided mid-thoracic disc herniation at T6-7 and a disc protrusion at T7-8 producing mild central stenosis and possible mild cord impingement. Further, he still complained of L5-S1 radicular pain. According to Dr. Rubino, by May 19, 2008, Mr. Celestine was enjoying eighty to ninety percent improvement of his back and right leg pain following a second steroid injection on April 16, 2008. Four months later, on August 20, 2008, Dr. Rubino found that his patient was still experiencing benefits from the injection. However, on March 11, 2009, Mr. Celestine reported to Dr. Rubino that he had experienced an exacerbation of his lower back pain and also experienced right upper paraspinal pain and tingling in his feet. A March 19, 2009 lumbar MRI revealed a disc bulge and facet degeneration at L3-4 and L4-5, causing some narrowing of the spinal canal, and by the office visit of May 11, 2009, Mr. Celestine was complaining of lower back pain radiating into his right leg and right paraspinal pain around the mid-lumbar area.

With regard to causation, Dr. Rubino dated the start of Mr. Celestine's back pain to the March 7, 2007 fit-for-duty test, concluding that while it was unlikely that the test caused the degenerative changes in Mr. Celestine's lumbar spine, it did cause nerve root irritation sufficient to produce his symptoms in his lower back and leg. According to Dr. Rubino, if Mr. Celestine did not benefit from future conservative

10

treatment,[4] he had two surgical treatment options: (1) a simple decompression via laminectomy to treat the radicular leg pain or (2) a decompression and fusion to treat the significant back pain. However, he did not recommend surgical intervention until all conservative measures had been exhausted. He assigned no formal physical restrictions to Mr. Celestine, but suggested that the degenerative changes in his back rendered Mr. Celestine prone to future symptomatic leg pain. Any activity which stretched his normal spine movement would, according to Dr. Rubino, accelerate the degenerative changes in his spine and possibly exacerbate his back and leg pain.

The only physician who examined Mr. Celestine on behalf of Firestone was its plant physician, Dr. Bonnie Drumwright of Sulphur, Louisiana. Dr. Drumwright examined Mr. Celestine on March 10, 2008, and her medical records indicate that at the time, Mr. Celestine informed her that "he still has occasional shooting pain in abdomen. Also states he has back pain since time of last functional test. Had MRI on back, states he has 'Ruptured Disc,' is supposed to have injection in spine on Wednesday. I feel pt. should not perform functional evaluation until cleared regarding _ back pain. Will have pt. sign release for me to talk to Dr. Snyder [sic]."

With regard to the claim of continued disability, Mr. Lounsberry testified that he provides functional job descriptions and determines job-specific criteria used in the fit-for-duty testing. To develop these reports, he generally visits the work site and observes and confers with the employees in order to determine the requirements and difficulties of a position. From this investigation, he determines which tasks are valid for a particular position, documents his findings, and sends a report to the employer

---

[4]Dr. Rubino identified his idea of conservative treatment as physical therapy, epidural steroid injections, and pain modulators.

11

for validation. Mr. Lounsberry performed such an evaluation for Firestone with regard to the A-2 computer operator position.

Based on his evaluation, Mr. Lounsberry concluded that there exists three physical demands associated with the job, although he ultimately determined that the position required only one[5]—lifting a twenty pound box of computer paper. When asked by the WCJ why Mr. Celestine could not move an individual pack of paper rather than the whole box, Mr. Lounsberry stated that it was not logical to think that someone would remove the reams of paper, move the box, and then restack the paper in the box. As a result of his on-site analysis, Mr. Lounsberry determined that an A-2 computer operator has two job specific requirements: (1) walk two hundred feet from the front gate to the work station and (2) lift twenty pounds.

As previously stated, Mrs. Lounsberry's testimony established that while Mr. Celestine successfully completed the fit-for-duty test, he had significant loss of body mechanics when performing lifts upward from the floor or near the floor. She testified that success in the testing process simply required Mr. Celestine to walk one hundred yards and (despite the fact that he was required to do a series of four lifts) to demonstrate the ability to safely lift twenty pounds from floor to knuckle height. With regard to Mr. Celestine's actual work duties, Mrs. Lounsberry testified that she did not know if he was ever required to lift a box of paper.

In concluding that Mr. Celestine suffered a work-related accident during the fit-for-duty test, the WCJ found that his testimony describing the incident was corroborated by Mrs. Lounsberry's notes, indicating his complaints of abdominal

---

[5]Mr. Lounsberry identified the other two as changing a forty pound water bottle and using a fifty-two pound fire extinguisher. He ultimately concluded that these could be handled by someone else as they were not totally essential to the day-to-day duties.

pulling, and by the history provided to Dr. McCalla by Mr. Celestine on March 13, 2007. Furthermore, the WCJ factually concluded that it found Mr. Celestine to be credible in light of the evidentiary record and his length of service with his employer. We find no manifest error in that conclusion. Thus, we find no merit in Firestone's first assignment of error.

On the issue of disability, Dr. Rubino said that Mr. Celestine would be at the point of maximum medical improvement if he remained symptom free for one year from April 16, 2008. Mr. Celestine did not do so and a subsequent MRI revealed a disc bulge and facet degeneration at L3-4 and L4-5. Furthermore, although Dr. Snider deferred to Dr. Rubino on the issue of causation, he stated that he would restrict Mr. Celestine from perform the lifting and bending portion of the fit-for-duty test and from lifting more than three to five pounds. Also, Dr. Drumwright indicated that Mr. Celestine should not undergo the fit-for-duty test until his lower back pain has resolved, which it has yet to do.

Based on these findings, Mr. Celestine is not capable of performing the fit-for-duty test and, thus, would be disabled from performing the A-2 computer operator position as Firestone considers passage of the test mandatory before a surgery patient can return to work. Thus, we find no manifest error in the WCJ's conclusion that Mr. Celestine is temporarily totally disabled due to his work-related accident of March 7, 2007. We find no merit in Firestone's second assignment as well.

### *Answer to Appeal*

In answering Firestone's appeal, Mr. Celestine argues that the WCJ erred in denying his claim for penalties and attorneys fees. Specifically, he asserts that

Firestone failed to reasonably controvert his claim by spending all of its time and

energy justifying its actions instead of assisting him to return to work.

> Pursuant to LSA-R.S. 23:1201(F), when an employer fails to commence payment of benefits timely, to pay continued installments timely, or to pay medical benefits timely, both penalties and attorney fees are recoverable unless the claims are reasonably controverted. A claim is reasonably controverted when the employer has sufficient factual and/or medical information to counter evidence presented by the claimant. *Zavala v. St. Joe Brick Works*, 2007-2217, p. 9 (La.App. 1 Cir. 10/31/08), 999 So.2d 13, 20-21, *writ denied*, 2008-2827 (La.1/30/09), 999 So.2d 762. *See also Joseph v. J.E. Merit Constructors, Inc.*, 2001-1666, p. 9 (La.App. 1 Cir. 6/21/02), 822 So.2d 72, 77-78, *writ denied*, 2002-2295 (La.4/4/03), 840 So.2d 1201.

*Alexander v. Sanderson Farms, Inc.*, 08-2225, p. 16 (La.App. 1 Cir. 5/8/09), 17 So.3d 5, 16.

In *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La. 12/1/98), 721 So.2d

885, 890, the supreme court further defined the meaning of "reasonably

controverted:"

> The phrase "reasonably controverted," on the other hand, mandates a different standard. In general, one can surmise from the plain meaning of the words making up the phrase "reasonably controvert" that in order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits. Thus, to determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La. R.S. 23:1201, a court must ascertain whether the employer or his insurer engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed.

Furthermore, the employer has a continuing duty to gather factual and/or medical

information in its investigation of the employee's workers' compensation claim.

*Ardoin v. Firestone Polymers, LLC*, 09-530 (La.App. 3 Cir. 12/30/09), 30 So.3d 177.

The decision of the WCJ to cast an employer with penalties and attorney fees is

factual in nature and, thus, will not be reversed absent manifest error. *Authement v. Shappert Eng'g*, 02-1631 (La. 2/25/03), 840 So.2d 1188.

In the matter before us, Firestone treated Mr. Celestine's claim more as one under its Pension, Insurance, and Savings Plan Agreement (Plan) than as a workers' compensation claim. The Plan provides those employees suffering from *non-work-related* accidents/illnesses eighty percent of their wages for up to thirty-nine weeks, but also provides that an employee absent from work for more than three days must provide Firestone an Accident/Sickness Status Report (A & S report/form/benefits) signed by his or her treating physician. Provision of this form triggers the payment of benefits for the length of time indicated by the physician and continued receipt of these benefits requires continued submission of the form by the employee. An employee's absence pursuant to an A & S report is considered excused, but Firestone considers absences without this documentation as unexcused and grounds for termination. The Plan further requires any employee off work as a result of surgery, a musculoskeletal strain, sprain, or fracture, or a heart condition to undergo fit-for-duty testing prior to resuming work.

As testified to by Mary Hunter, Firestone's human resource coordinator, Mr. Celestine complied with the Plan's requirements following his 2007 colon surgery as well as his hernia repair surgery. However, according to Ms. Hunter, neither A & S form mentioned a back injury. However, because Mr. Celestine indicated that his hernia was employment related, Ms. Hunter turned his claim over to Jayde Butler, Firestone's occupational health nurse. In doing so, she wrote Mr. Celestine to inform him of her actions, and of his disqualification under the Plan.

15

Ms. Butler testified that once Dr. McCalla released Mr. Celestine to work in January of 2008, she scheduled him to see Dr. Drumwright and to retake the fit-for-duty test. According to Ms. Butler, when she told Mr. Celestine of his fit-for-duty testing obligation under the Plan, he informed her that the March 2007 test caused not only his hernia, but also an injury to his lower back; that he was being treated by Dr. Snider for the lower back injury; and that he did not intend to re-take the test. Ms. Butler testified that this was the first she heard of his back injury.

To follow-up on her conversation with Mr. Celestine, Ms. Butler forwarded Mr. Celestine's job description to both Dr. McCalla and Dr. Snider on January 17, 2008. She testified that she received information from Dr. McCalla's office that he would release Mr. Celestine to return to work without restrictions, and initially received information from Dr. Snider's office that the doctor felt his patient could safely undergo the fit-for-duty testing but that Mr. Celestine did not wish to undergo the test. After several discussions with Dr. Snider's office, on February 13, 2008, Ms. Butler received an A & S Form from the doctor's office stating that Mr. Celestine did not want the doctor to comment further on his condition. At that point, Ms. Butler transferred the case back to Firestone's Human Resource Department. However, she was later notified that Mr. Celestine had written, stating that he was waiting for her to contact him concerning his return to work. On March 5, 2008, she scheduled March 10, 2008 appointments for Mr. Celestine with Dr. Drumwright and Industrial Strength Work Rehabilitation Center.

Ms. Butler testified that after her examination of Mr. Celestine, Dr. Drumwright informed her that she was restricting Mr. Celestine from performing the fit-for-duty test based on his complaints of back pain. She stated that Dr.

16

Drumwright, who obtained Mr. Celestine's permission to contact Dr. Snider, learned that Mr. Celestine refused to undergo the fit-for-duty test and that he was being treated by Dr. Rubino for his back pain. Based on this information, Ms. Butler stated that Firestone needed an A & S form from both Dr. Rubino and Dr. Snider. Ms. Butler stated that Firestone never received a release from Dr. Rubino.

Mary Fontenot, Firestone's human resource coordinator, testified that her supervisor and Firestone's human resources manager, Sheryl Griffin, instructed her to pay Mr. Celestine pursuant to the Plan beginning October 11, 2007. Because the A & S form in effect only covered Mr. Celestine through January 15, 2008, she wrote Mr. Celestine on March 10, 2008, requesting an updated A & S form. On March 19, 2008, she informed him that she was authorizing his A & S benefits through the date of Dr. Drumwright's examination, March 10, 2008, and requested that an updated A & S report be returned to her by April 4, 2008. When he did not respond, Ms. Fontenot wrote Mr. Celestine on April 24, 2008, and informed him that Firestone required either a signed A & S form or a full release from Dr. Rubino. When Mr. Celestine failed to attend a meeting she had scheduled, Firestone terminated his employment.

Ms. Griffin testified that she became involved in Mr. Celestine's case in 2008, because of the difficulty Firestone was experiencing in returning him to work. In a February 18, 2008 letter, she informed Mr. Celestine that his workers' compensation claim was denied based on a lack of evidence; that his last excused absence was January 15, 2008; that any absence after January 15, 2008 would be treated as unexcused; that he should contact Ms. Butler in order to facilitate his return to work; and that failure to comply would result in the termination of his employment. Ms.

Griffin testified that Firestone decided to pay Mr. Celestine A & S benefits even though he claimed a work-related injury.

Ms. Griffin stated that she, not Ms. Butler, scheduled the March 10, 2008 appointment for Mr. Celestine with Dr. Drumwright. When Dr. Drumwright related Mr. Celestine's claim of back injury to Ms. Griffin, she informed Mr. Celestine that Firestone required an updated A & S report to substantiate his continued absence from work and his continued receipt of A & S benefits. According to Ms. Griffin, when Mr. Celestine failed to comply, she arranged a meeting at Firestone's plant in order to discuss the situation with him. She testified that her goal in having the meeting was to either return Mr. Celestine to work or to obtain a doctor's restriction. When Mr. Celestine failed to attend the meeting and failed to respond to a telephone message, Ms. Griffin stated that she wrote him on June 5, 2008, asking that he submit either a completed A & S report or a full-duty work release from his treating physician. After he failed to respond, Ms. Griffin stated that she wrote him on June 13, 2008, informing him that his employment was terminated as of June 11, 2008.

In her oral reasons, the WCJ found that Mr. Celestine's poor articulation and the Firestone's policy requirements "caused a terrible and unfortunate breakdown in communications resulting in Mr. Celestine's firing." As a result, the WCJ found that this matter "has been at least reasonably controverted" and denied Mr. Celestine's request for penalties and attorney fees. However, after reviewing the record in its entirety, we find that the WCJ's decision to deny penalties and attorney fees was in error.

While we find that the WCJ's decision to deny penalties and attorney fees was in error, we do not find that the factual findings on this issue were manifestly

18

erroneous. The record establishes that as stated by the WCJ, Firestone allowed its policy requirements, as found in the Plan, to overshadow its requirements under the Workers' Compensation Act. In fact, the only thing Firestone did within its workers' compensation obligation was to turn the matter over to Gallagher Bassett after receipt of Mr. Celestine's October 29, 2007 A & S report stating that his hernia was employment related. Unfortunately, after Gallagher Bassett denied the claim on January 26, 2008—and even after Mr. Celestine filed a disputed claim for benefits on February 28, 2008, Firestone continued to treat the claim in the context of the Plan.

After the February 28, 2008 filing, Firestone did nothing to investigate this claim as a workers' compensation claim. Instead, it sought to obtain completed A& S reports from Drs. McCalla, Snider, and Rubino. When Mr. Celestine refused to meet with representatives of Firestone and failed to provide an A & S report, he was fired for that simple fact alone and under the policy associated with the Plan.

With regard to Mr. Celestine's medical condition, the record is devoid of any evidence indicating that Firestone "possessed factual and/or medical information to reasonably counter the factual and medical information presented" by Mr. Celestine in the pursuit of his claim. *Ardoin*, 30 So.3d at 184. Firestone did nothing to ascertain his condition other than in the context of following its' A & S procedures: determining from his treating physicians the reason Mr. Celestine was restricted from working and whether he could safely perform the fit-for-duty testing. Firestone made no effort to investigate the cause of Mr. Celestine's back condition despite the fact that Dr. Rubino opined on October 31, 2008, that the fit-for-duty test caused Mr. Celestine's nerve root irritation which in turn caused his lower back and right leg symptoms.

Based on these findings, we reverse the judgment of the WCJ denying Mr. Celestine's request for penalties and attorney fees and we now render judgment awarding him $8,000.00 in penalties and $10,000.00 in attorney fees. Further, based on this finding and in response to Mr. Celestine's answer to appeal, we award him an additional $5,000.00 in attorney fees for work performed on appeal.

## CONCLUSION

For the foregoing reasons, the judgment of the workers' compensation judge is reversed in part and judgment is now rendered awarding the plaintiff, Ragle Celestine, $8,000.00 in penalties and $10,000.00 in attorney fees, with an additional $5,000.00 in attorney fees for work performed on appeal. The judgment of the WCJ is affirmed in all other respects. The costs of this appeal are assessed to the defendant, Firestone Polymers, LLC.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**