# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 10-0318


ANGELA ASHWORTH

VERSUS

ADMINISTAFF, INC.


************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DIST. 03
PARISH OF CALCASIEU, NO. 06-04037
HONORABLE CHARLOTTE BUSHNELL
WORKERS' COMPENSATION JUDGE

************

## JIMMIE C. PETERS
## JUDGE

************

Court composed of Jimmie C. Peters, Billy H. Ezell, and Shannon J. Gremillion, Judges.


**AFFIRMED AS AMENDED.**

George A. Flournoy
Flournoy & Doggett (APLC)
P. O. Box 1270
Alexandria, LA 71309
(318) 487-9858
COUNSEL FOR PLAINTIFF/APPELLANT:
    Angela Ashworth

John J. Rabalais
Janice B. Unland
Matthew D. Crumhorn
Rabalais, Unland & Lorio
200 Caroline Court
Covington, LA 70433
(985) 893-9900
COUNSEL FOR DEFENDANT/APPELLEE:
    Administaff, Inc.

PETERS, J.

In this workers' compensation litigation, the workers' compensation judge (WCJ) found that the plaintiff, Angela Ashworth, sustained a compensable injury while employed by Administaff, Inc. (Administaff), and awarded benefits and penalties. However, the WCJ concluded that certain physical complaints related to Mrs. Ashworth's neck, lower back, and shoulder were not work-related. In her appeal, Mrs. Ashworth seeks a reversal of the WCJ's determination relative to her upper-body complaints and seeks an increase in the $6,000.00 award of penalties. For the following reasons, we affirm the WCJ's factual findings with regard to Mrs. Ashworth's physical complaints but amend the WCJ judgment to increase the penalty award by $2,000.00.

## DISCUSSION OF THE RECORD

At the time of her November 1, 2005 accident, Administaff[1] employed Mrs. Ashworth as a merchandiser. Her employment involved traveling to stores serviced by her employer to address merchandising issues. The accident giving rise to this litigation occurred at a Lowe's store in Amarillo, Texas, when a display containing eight shower doors fell and pinned Mrs. Ashworth to the floor. It is undisputed that Mrs. Ashworth suffered three fractures to her right ankle and underwent surgery the next day for the placement of an internal fixation via a metal plate and screws. However, the first recorded complaint of neck, lower back, and shoulder pain is found in the records of Dr. Elemer Raffai, a Eunice, Louisiana orthopedic surgeon, three months after the accident. Administaff acknowledged its responsibility for the ankle injury, but denied responsibility for the other physical complaints.

---

[1]Administaff entered into a Client Service Agreement with Brian Mallard Group of Texas, LP (Brian Mallard) to provide personnel management services to Brian Mallard on site at job locations. The agreement between the two provides that Administaff and Brian Mallard are considered co-employers of the worksite employees assigned to Brian Mallard's worksite.

On June 26, 2006, Mrs. Ashworth filed a disputed claim for compensation against Administaff and its workers' compensation insurer, Specialty Risk Services. Administaff terminated Mrs. Ashworth's temporary total disability (TTD) benefits as of July 12, 2006, but then reinstated them on April 15, 2007, after issuing her a check in the amount of $10,853.95. On February 11, 2009, Administaff terminated Mrs. Ashworth's TTD benefits and commenced paying supplemental earnings benefits (SEB) on February 16, 2009.

Following a trial on the merits, the WCJ rendered oral reasons for judgment finding that Mrs. Ashworth proved that her right ankle and knee problems, as well as her depression, were work-related, but that her other complaints were not. The WCJ awarded her reasonable and necessary medical treatment for her conditions, but found that surgery on her right knee was not warranted at the time. The WCJ further awarded Mrs. Ashworth $14,000.00 in penalties and $15,000.00 in attorney fees. After executing a formal judgment, the WCJ granted Mrs. Ashworth's motion for new trial and amended the judgment ordering Administaff to pay any and all past due amounts owed.

Mrs. Ashworth appealed this judgment, raising two assignments of error:

I.    Did plaintiff prove, by a reasonable preponderance, that the most likely cause of plaintiff's cervical, left shoulder and low back pain and discomfort was her work accident on November 1, 2005?

II.   Did plaintiff prove, by a reasonable preponderance, multiple [La.R.S. 23]:1201(F) violations, entitling her to an additional $2,000.00 in penalties?

2

**OPINION**

The standard of review applied in workers' compensation matters is the "manifest error—clearly wrong" standard. *Dean v. Southmark Constr.*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117.

> Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander* [*v. Pellerin Marble & Granite*, 93-1698 (La. 1/14/94) ], 630 So.2d [706,] 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Robinson v. North American Salt Co.*, 02-1869 (La.App. 1 Cir.2003), 865 So.2d 98, 105. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Robinson*, 865 So.2d at 105. The determination of whether injury occurred in the course and scope of employment is a mixed question of law and fact. *Winkler v. Wadleigh Offshore, Inc.*, 01-1833 (La.App. 4 Cir. 4/24/02), 817 So.2d 313, 316 (citing *Wright v. Skate Country, Inc.*, 98-0217 (La.App. 4 Cir. 5/12/99), 734 So.2d 874).

*Id.*

In order to receive workers' compensation benefits, an injured employee must establish a causal connection between their work-related accident and the resulting complained of disability. *Davis v. State ex rel. Dept. of Transp. and Dev., Office of Risk Management*, 09-288 (La.App. 3 Cir. 11/10/09), 27 So.3d 969. The burden of proof is by a preponderance of the evidence. That being the case, if the probability of causation is equally balanced based on the evidence presented, then the employee has not carried her burden of proof. *Guilbeaux v. Office of District Attorney*, 07-89 (La.App. 3 Cir. 5/30/07), 957 So.2d 959, *writ not considered*, 07-1354 (La. 9/28/07), 964 So.2d 366.

The accident involving Mrs. Ashworth occurred at approximately 3:00 p.m. on November 1, 2005, as the 700-pound-shower-door display she was checking came

3

crashing down on her. Mrs. Ashworth testified that as the display fell, she raised her left arm in a defensive action, but the display was too heavy. She fell underneath the display, twisting from her right to her left. According to Mrs. Ashworth, it took eight workers to lift the display, and she crawled out on her knees and elbows. She testified that it was the twisting of the ankle, not the impact of the display that caused it to break. Although she was in shock, she knew immediately that she had broken her ankle.

Mrs. Ashworth acknowledged that she made no complaint of neck, back, or shoulder pain at the emergency room immediately after the accident. She underwent surgery on the ankle the next day, and was ordered to two weeks bed rest thereafter. During that two weeks, according to Mrs. Ashworth, her prescribed pain medication dulled all pain. She testified that she first started feeling pain in her neck, lower back, and shoulder a couple of weeks after the accident and first related that pain on November 10, 2005, to Dr. Thane Morgan, the Texas orthopedic surgeon who performed her surgery. According to Mrs. Ashworth, Dr. Morgan attributed her pain to her current use of crutches. She continued to use crutches for approximately three months following her accident.

According to Mrs. Ashworth, she also related her neck, lower back, and shoulder pain to a Hattiesburg, Mississippi physician at the Forrest General Hospital when she had her ankle cast checked on November 17, 2005.[2] She testified that this physician gave her the name of a physician she should see for these complaints. She also sought treatment for problems with her cast at the Memorial Hospital in Gulfport, Mississippi, two days later, but could not recall whether she related her

_____

[2]Mrs. Ashworth was in Hattiesburg with her husband, who also worked for Administaff, and who had been transferred to a job in Mississippi.

4

upper body complaints to the treating physician at that time. She returned to Memorial Hospital two days later to have the staples removed from her ankle, and does recall complaining of neck, back, or shoulder pain at that time. As was the case in Hattiesburg, the Gulfport physician suggested that she obtain an appointment with another physician to have these complaints evaluated. Within a few days after this doctor visit, Mrs. Ashworth found herself in Oakdale, Louisiana, where, on November 25, 2005, she presented herself to the Oakdale Community Hospital with ankle pain complaints.[3]

In the meantime, Genex Services, Inc. (Genex)[4] scheduled Mrs. Ashworth for a November 28, 2005 appointment with Dr. Keith Melancon, a Hattiesburg orthopedic surgeon. Mrs. Ashworth kept that appointment, and she asserted in her testimony that she attempted to relate her upper body complaints to Dr. Melancon, but was prohibited from doing so. According to Mrs. Ashworth, her nurse case manager told her not to list anything except her right ankle complaints when filling out the patient questionnaire, and she said that when she tried to talk to the doctor about her upper body complaints, he informed her that he was only allowed to treat her ankle and knee pain.

Dr. Melancon did prescribe physical therapy for the ankle and knee, and Mrs. Ashworth underwent physical therapy at Louisiana Physical Therapy Center in Oakdale, Louisiana in January of 2006. She testified that when she complained to the physical therapist of her neck, lower back, and shoulder pain, the physical therapist told her the same thing as did Dr. Melancon—he was only allowed to provide therapy

---

[3]Mrs. Ashworth does not remember this visit to the emergency room.

[4]Genex was retained by Specialty Risk Services to manage Mrs. Ashworth's care, and it provided her with a nurse case manager who scheduled and attended her appointments.

for her ankle and knee. Dr. Raffie first saw Mrs. Ashworth on January 26, 2006, and he was still treating her as of the time of trial.

Two months after starting treatment with Dr. Raffie, on March 30, 2006, Mrs. Ashworth was examined by Dr. Samir S. Ebead, an Orange, Texas IME. According to Mrs. Ashworth, as was the case with the other doctors, Dr. Ebead simply did not want to hear about her upper body complaints. She testified that each time she attempted to talk about her neck, back, and shoulder complaints, Dr. Ebead would turn off his recorder and would explain that the only complaints he was interested in were those associated with the ankle and knee.

According to Mrs. Ashworth, when Dr. James Perry, a Lake Charles, Louisiana orthopedic surgeon, examined her at the request of Administaff on July 9, 2007 and December 15, 2008, she related the particulars of the accident, including her upper body complaints. After his second examination, Dr. Perry told her that he would submit his report and get the matter moving forward. However, in her conversation with the doctor, he did not relate to her which complaints he considered to be work-related.

In her testimony, Mrs. Ashworth acknowledged that she was involved in a November 2001 automobile accident, as a guest passenger in a vehicle that was driven into a ditch and that she failed to relate this history to any of the physicians with whom she sought evaluation and treatment. After the accident, Mrs. Ashworth was examined at the Oakdale Community Hospital in Oakdale, Louisiana and denies relating any complaints of neck or back pain. According to Mrs. Ashworth, the only injury she sustained in the accident was a bump on the head from hitting the dashboard. However, the medical records of Community Hospital for November 25,

6

2001, reveal the emergency room physician's clinical impression of low back pain, neck sprain, abdominal pain, as well as a contusion on Mrs. Ashworth's forehead.

Dr. Raffai's January 26, 2006 records do reflect that Mrs. Ashworth complained of neck and lower back pain and headaches, in addition to pain in the right ankle and knee, when he first examined her. As a result of the history provided, Dr. Raffai's initial diagnosis was that of a whiplash injury, sprain of the neck and lower back, healed fracture of the right ankle, and a right knee sprain. The doctor recorded Mrs. Ashworth's first complaint of shoulder pain on February 8, 2007, and recommended that an MRI of her shoulder and cervical spine be performed. Thereafter, on May 15, 2007, Dr. Raffai also recommended an MRI of her lower back. These MRIs were performed on November 12, 2007, revealing a disc bulge at L5-S1 and a broad-based osteophyte[5] disc complex at C5-6 with mass effect on the thecal sac but no mass effect on the spinal cord.

Dr. Raffai testified that without the benefit of the further diagnostic studies which he had requested, his diagnosis was that of chronic neck and lower back pain, a left shoulder impingement, possible torn right knee cartilage, and right ankle post-traumatic arthritis. He had asserted in a February 4, 2009 letter to a medical nurse manager, that it was his opinion that Mrs. Ashworth's neck, lower back, and shoulder complaints were work-related. However, he did acknowledge that the bone spur at C5-6 could be either trauma-related or degenerative in nature and that a pre-accident MRI would be necessary to definitively resolve the cause.

In his deposition, Dr. Raffai continued to assert his opinion that Mrs. Ashworth's complaints were work-related even though she made no complaints of

_____

[5]Bone spur.

7

neck, lower back, and shoulder pain prior to January 26, 2005. He based this opinion on his conclusion that he had no reason to doubt Mrs. Ashworth because she seemed straightforward to him in the presentation of her complaints and because he found nothing to cause him to believe she was malingering. Dr. Raffai explained that patients suffering multiple injuries arising from trauma complain of the most acute problem first, and they may not necessarily feel pain elsewhere as inflammation in the soft tissues, neck, and even the knees takes a few days to set in. In reviewing Dr. Melancon's records, Dr. Raffai stated that Dr. Melancon was probably focused on the most significant problems at the time, the ankle fracture and right knee, and may not have discussed Mrs. Ashworth's chronic neck and back pain.

The record is clear that the primary focus after the accident was the injuries to Mrs. Ashworth's ankle and knee. Neither the Employers First Report of Injury or Illness, dated November 2, 2005; the emergency room records of the Northwest Texas Healthcare System in Amarillo; nor the initial hospital records lists anything other than the ankle and knee injuries. Additionally, subsequent medical records do not support Mrs. Ashworth's testimony that she did relate her upper body complaints to other medical care givers before seeing Dr. Raffie in January of 2006. These include Dr. Morgan's records eight days after surgery; the records of both Forrest General Hospital in Hattiesburg and Memorial Hospital in Gulfport; and Dr. Melancon's November 28, 2005 records. In fact, Dr. Melancon's records of that date contain the notation that when questioned during the doctor's musculoskeletal system examination, Mrs. Ashworth "denie[d] any pains, aches, strains, or any musculoskeletal problems."

8

Dr. Perry opined that the bulging disc at C5-6, was not work-related as the mechanism of the injury did not fit this result. Additionally, according to Dr. Perry, the disc bulge at L5-S1 was more chronic in nature and probably would have existed even absent her accident. He described the bulge as an age-related change, explaining that an age-related bulge is more diffuse and circumferential, as opposed to a herniation, such as that caused by trauma, which is more focal in nature. With regard to her lumbar spine, Dr. Perry stated that the November 7, 2007 MRI was normal. Based on his findings, he concluded that none of Mrs. Ashworth's neck, lower back, or left shoulder complaints were work-related. He testified that she may have had a "minor little upset for a very short period of time, maybe, but at best, that's it. I can't say that she had neck and back pain of a chronic nature from that . . . it doesn't add up."

Dr. Lynn E. Foret, a Lake Charles, Louisiana orthopedic surgeon, examined Mrs. Ashworth on March 20, 2009, pursuant to an order issued by the WCJ. After examining Mrs. Ashworth and reviewing her medical records, Dr. Foret reached the conclusion that her shoulder complaints were more related to nerve root irritation in her neck. He based this on a normal shoulder MRI and objective findings of cervical radiculitis in her right shoulder and arm and pain in her interscaspular and trapezius regions. With regard to the cervical complaints, Dr. Foret testified that it would be difficult to express an opinion three-and-a-half years after the accident concerning whether Mrs. Ashworth's cervical complaints were work-related. He testified that osteophytes are mostly old, but, if a disc is blown out in the area of the bone spur, the disc will show significant changes. Thus, he would expect that a second cervical MRI would reveal whether the disc complaint at C5-6 is work-related. If an MRI

reveals significant changes after the November 11, 2007 MRI, then the disc complaint would be work-related. A June 11, 2009 MRI of the cervical spine revealed that the appearance of the osteophyte disc complex at C5-6 was similar to that of the November 11, 2007 MRI. According to Dr. Foret, this would indicate that the C5-6 complaints were not related to the accident of November 1, 2005.

Dr. Foret also concluded that Mrs. Ashworth's lower back complaints are not work-related, basing this opinion on the fact that the November 11, 2007 MRI revealed a small hemangioma at T11, which he explained has "been there forever," and a slight disc bulge at L5-S1, which he felt was compatible with her age. Dr. Foret explained that bulges at that location start developing at approximately thirty years of age. He testified that based on Mrs. Ashworth's accident, he would expect her to suffer a myofascial strain in her lower back, which he said usually clears up within three to six months.

Mrs. Ashworth's medical records were also reviewed by Dr. David H. Trotter, a Texas and Illinois orthopedic surgeon, and Dr. Bruce Beavers, a Dallas, Texas orthopedic surgeon. Based on their evaluation of the medical records, both doctors concluded that Mrs. Ashworth's upper body complaints were not related to the accident of November 1, 2005. Dr. Trotter concluded that "[t]he claimant's ongoing conditions would appear at other sites to be related to pre-existing degeneration to plausible unreported intervening injuries or conditions and/or to a combination of the preceding along with unsupported condition attribution on the part of the claimant with regards to the DOI."

In the oral reasons for judgment, the WCJ found that Mrs. Ashworth failed to prove that her neck, shoulder, and lower back complaints were causally related to her

work accident. The WCJ stated: "While Mrs. Ashworth's testimony is that she reported these ailments, the medical records do not support her contention. The Court notes that she did complain to Dr. Raffia less than three months after the accident; however, the medical evidence does not causally relate these problems to the work accident."

After reviewing the record, we cannot say that the WCJ was manifestly erroneous in its factual conclusions. Despite her claims that she complained to various doctors prior to Dr. Raffai, the diagnostic studies point to no evidence of a work-related complaint in those areas. Mrs. Ashworth's MRIs were unremarkable except for an age-related disc bulge at L5-S1 and an osteophyte disc complex at C5-6. Dr. Foret stated that a lack of significant changes in a more recent cervical MRI will indicate that the bone spur and disc predate the work accident. The June 11, 2009 MRI bears this out, as the reviewer found no change in the appearance of the osteophyte disc complex compared to November 11, 2007. Accordingly, the judgment of the WCJ denying Mrs. Ashworth's claim for workers' compensation benefits as regards her neck, shoulder, and lower back is affirmed.

In her next assignment of error, Mrs. Ashworth argues that the WCJ erred by failing to award her the maximum amount of penalties available pursuant to La.R.S. 23:1201(F), or $8,000.00. In the original and amended judgment, the WCJ awarded Mrs. Ashworth $2,000.00 in penalties based on Administaff's improper conversion of her TTD benefits to SEB; $2,000.00 for its failure to pay the correct rate of indemnity benefits; $2,000.00 for its failure to authorize medication for psychological problems and timely reimburse for prescription medication and/or medical visits; and $8,000.00 for discontinuance of benefits pursuant to La.R.S. 23:1201(F).

11

The determination of whether an employer should be cast with penalties is a question of fact which will not be reversed on appeal absent manifest error. *Romero v. Northrop-Grumman*, 01-24 (La.App. 3 Cir. 5/30/01), 787 So.2d 1149, *writ denied*, 01-1937 (La. 10/26/01), 799 So.2d 1144. The failure to provide payment of workers' compensation indemnity benefits will result in an assessment of penalties and attorney fees pursuant to La.R.S. 23:1201(F).

Mrs. Ashworth presents three reasons why the WCJ could have awarded an additional $2,000.00 in the instant matter. After reviewing the record, we find merit in this argument and award her an additional $2,000.00 in penalties based on Administaff's failure to pay her indemnity benefits between February 12 and February 15, 2009. Specialty Risk's payment records reflect that Mrs. Ashworth received a payment for TTD benefits for the period between February 5 and 11. She next received a payment for SEB for the period between February 16 through March 17. The WCJ did not address this failure in the judgment. As the WCJ held that Administaff improperly converted Mrs. Ashworth's TTD benefits to SEB, she was entitled to TTD benefits for the period between February 12 and 15. Accordingly, we find that it was error for the WCJ not to award Mrs. Ashworth $2,000.00 in penalties based on Administaff's failure to pay these benefits. La.R.S. 23:1201(F). We amend the judgment of the WCJ to provide for this award.

## CONCLUSION

For the foregoing reasons, we amend the judgment of the workers' compensation judge to award an additional $2,000.00 in penalties to Angela Ashworth. We affirm the judgment as amended, and assess all costs of these proceedings to Administaff, Inc.

**AFFIRMED AS AMENDED.**