# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-1595

BARBARA BROWN

VERSUS

LAFAYETTE ASSOCIATION OF RETARDED CITIZENS, INC.

**********

### APPEAL FROM THE
### OFFICE OF WORKERS' COMPENSATION - DISTRICT 4
### PARISH OF LAFAYETTE, NO. 10-02240
### SHERAL KELLAR, WORKERS' COMPENSATION JUDGE

**********

### JIMMIE C. PETERS
### JUDGE

**********

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

AFFIRMED AND RENDERED.

Gremillion, J., concurred in part and dissented in part and assigns reasons.

John H. Pucheu
Pucheu, Pucheu & Robinson
P.O. Box 1109
Eunice, LA 70535-1109
(337) 457-9075
COUNSEL FOR PLAINTIFF/APPELLEE:
    Barbara Brown

**M. Jeremy Berthon**
**Johnson, Stiltner & Rahman**
**P. O. Box 98001**
**Baton Rouge, LA 70898-8001**
**(225) 231-0925**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Lafayette Association of Retarded Citizens, Inc.**
    **Louisiana Workers' Compensation Corporation**

PETERS, J.

The defendants, the Lafayette Association of Retarded Citizens, Inc. and the Louisiana Workers' Compensation Corporation, appeal from a judgment of the workers' compensation judge (WCJ) finding that the plaintiff, Barbara Brown, suffered a work-related accident and that she was entitled to statutory penalties and attorney fees. Mrs. Brown answered the appeal, seeking an award of additional attorney fees for work performed by her attorney on appeal. For the following reasons, we affirm the WCJ judgment in all respects and award Mrs. Brown an additional $5,000.00 as attorney fees for work performed by her attorney on appeal.

## DISCUSSION OF THE RECORD

The evidentiary record establishes that on the morning of November 3, 2009, Mrs. Brown was employed by the Lafayette Association of Retarded Citizens, Inc. (LARC) as a direct care specialist in LARC's Lafayette Parish facility. LARC provides a home environment for intellectually disabled individuals at its facility. Mrs. Brown had been employed by it for a period of approximately seven months. As a direct care specialist, Mrs. Brown was directly involved in the care of the residents, and this care including lifting, feeding, bathing, changing, training, and transporting the residents as the need arose.

On November 3, 2009, Mrs. Brown arrived at work at 6:00 a.m. and began her daily routine. While attempting to lift a resident, she felt a pain in her chest. Although the resident weighed only approximately 160 pounds, Mrs. Brown had to wait for five to ten minutes after experiencing the initial pain before moving the resident into her wheelchair.

A short time later, after returning to her work obligations, Mrs. Brown felt the pain in her chest return. Because she had suffered a heart attack in 2007, she sat down and took a nitroglycerine pill. She testified that she spilled her pills when

attempting to retrieve one from her purse, and one of her co-workers, Connie Redeaux, helped her pick them up. Ms. Redeaux recalled the incident, testifying that she came upon Mrs. Brown sitting down and holding her chest. Ms. Redeaux recognized that something was very wrong and advised Mrs. Brown to inform Henrietta Grant, their supervisor, of her condition.

Mrs. Brown did not initially follow Ms. Redeaux's advise. Instead, she returned to her duties after sitting for a few minutes. However, a short time later while delivering medication to a resident, she became hot and felt a heaviness over her left shoulder and down her legs. At this point, she knew that she was suffering another heart attack. She returned to her assigned area, informed Ms. Grant of her situation, and asked Ms. Grant to telephone her husband, Ivory J. Brown, Jr. Ms. Grant made the telephone call, and a co-worker drove Mrs. Brown to meet her husband. Mr. Brown, driving from Crowley, intercepted the co-worker between the facility and Crowley and carried his wife to the Crowley American Legion Hospital. Once stabilized, she was transported by ambulance to the Heart Hospital of Lafayette in Lafayette, Louisiana, where she was treated for a blocked stent by her regular cardiologist. Upon her release the next day, her husband drove her to the LARC facility where she gave her supervisor a work excuse from her cardiologist.

Two days later, Mrs. Brown presented herself to Dr. Yamen Korab, a Crowley, Louisiana family practice physician and Mrs. Brown's family physician, complaining of left-sided neck pain. She returned to Dr. Korab on November 24, 2009, complaining of pain in her neck and down into her shoulder and behind her left knee, numbness in her toe, and ringing in her ears. A cervical MRI ordered by Dr. Korab revealed a small central disc protrusion at C3-4 and mild spondylosis

2

impinging on the left side of the neural foramina at C5-6 and C6-7. Based on this finding, Dr. Korab recommended that Mrs. Brown see a neurosurgeon.

On January 11, 2010, Mrs. Brown saw Dr. Patrick A. Juneau, III, a Lafayette, Louisiana neurosurgeon, complaining of neck and lower back pain relating back to November of 2009. Mrs. Brown told Dr. Juneau that she had suffered a heart attack while lifting a patient but, afterwards, she also began to experience pain in her neck and lower back. After examining her and reviewing the results of the MRI ordered by Dr. Korab, Dr. Juneau concluded that Mrs. Brown had suffered a work-related injury, but that her MRI revealed only mild degenerative changes. At this point, he ordered that a lumbar MRI be performed, and the results of that test proved normal.

When she returned to Dr. Juneau on March 1, 2010, Mrs. Brown was complaining of increased neck and bilateral arm pain, worse on the left side; numbness and tingling sensations in her arms and legs, worse on the left side; numbness and tingling sensations in her left foot, particularly in her fourth and fifth toes; and numbness and tingling sensations in her right great toe. Dr. Juneau's examination revealed that Mrs. Brown exhibited diminished sensation over the lateral aspect of her left foot, into the fourth and fifth toes, and over the right great toe. He found these symptoms consistent with left S1 radiculopathy and possible involvement of the L5 nerve root. Given his findings, Dr. Juneau prescribed several tests to pinpoint whether Mrs. Brown's pain was discogenic or muscular in nature. LARC refused to approve payment for these tests.

Mrs. Brown's physical condition continued to deteriorate and on May 25, 2011, Dr. Juneau noted after examining Mrs. Brown that she continued to have complaints of pain in her neck; left trapezius muscle; arm; forearm; and hand, with

3

tingling sensations in her second, third, and fourth fingers, especially the third finger; as well as pain radiating across the right trapezius muscle to the shoulder. After closely reevaluating Mrs. Brown's cervical MRI in light of her current presentation, Dr. Juneau concluded that his patient was suffering from foraminal stenosis on the left at C5-6 and C6-7. Based on this diagnosis, he recommended that rather than undergo testing, Mrs. Brown undergo an anterior cervical discectomy with instrumented fusion at C5-6 and C6-7. LARC refused to approve payment for this treatment as well.

On March 8, 2010, Mrs. Brown filed a disputed claim for compensation against LARC and the Louisiana Workers' Compensation Corporation (LWCC), seeking indemnity and medical benefits and the medical testing and treatment recommended by Dr. Juneau. Following an August 2, 2011 trial on the merits, the WCJ rendered oral reasons for judgment on August 17, 2011, finding that Mrs. Brown suffered a work-related accident on November 3, 2009, and awarding her indemnity benefits and all reasonable and necessary medical treatment, including surgery and mileage associated with her medical treatment. The WCJ further awarded Mrs. Brown $6,000.00 in statutory penalties and $12,500.00 in attorney fees. After the WCJ reduced its reasons for judgment to a written judgment, LARC and LWCC perfected this appeal. In their appeal, LARC and LWCC raise three assignments of error:

1. The Workers' Compensation Judge committed manifest error in finding the claimant met her burden of proof that she was injured by an accident on the job.

2. The Workers' Compensation Judge committed manifest error in awarding penalties and attorney fees.

3. The Workers' Compensation Judge committed legal error in awarding an additional penalty for failure to approve a surgery recommended by Dr. Patrick Juneau.

4

Additionally, Mrs. Brown answered LARC and LWCC's appeal to request an additional award of attorney fees based on the work performed by her counsel in defending this appeal.

## OPINION

In the recent case, *Ardoin v. Firestone Polymers, L.L.C.*, 10-245, pp. 4-7 (La. 1/19/11), 56 So.3d 215, 218-220 (emphasis in original), the Louisiana Supreme Court detailed the law pertaining to a worker's burden of proof on causation:

> A worker in a compensation action must establish "personal injury by accident arising out of and in the course of his employment." La.Rev.Stat. 23:1031(A). An accident is "an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration." La.Rev.Stat. 23:1021(1). As in other civil actions, the plaintiff-worker in a compensation action has the burden of establishing a work-related accident. *Nelson v. Roadway Express, Inc.*, 588 So.2d 350 (La.1991); *Prim v. City of Shreveport*, 297 So.2d 421 (La.1974). An employee may prove by his or her testimony alone that an unwitnessed accident occurred in the course and scope of employment if the employee can satisfy two elements: (1) no other evidence discredits or casts serious doubt upon the worker's version of the incident; and (2) the worker's testimony is corroborated by the circumstances following the alleged accident. *Bruno v. Harbert International, Inc.*, *supra*, 593 So.2d at 361 (citing *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146 (La.1979); Malone and Johnson, 13 *Civil Law Treatise, Workers' Compensation*, Section 253 (2d Ed.1980)). As we noted in *Bruno*, corroboration of the worker's testimony may be provided by the testimony of fellow workers, spouses, or friends, or by medical evidence. *Id.* (citing *West*, *Nelson*, and Malone and Johnson).
>
> In *Bruno*, we cautioned that, in deciding whether the plaintiff-worker has discharged his or her burden of proof, the fact-finder "should accept as true a witness's uncontradicted testimony, although the witness is a party, absent 'circumstances casting suspicion on the reliability of this testimony.'" 593 So.2d at 361 (quoting *West*, 371 So.2d at 1147, and citing *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987)). The fact-finder's determinations as to whether the worker's testimony is credible and whether the worker has discharged his burden of proof are, most certainly, factual determinations that should not be disturbed on appellate review unless clearly wrong or manifestly erroneous. *Id.* (citing *Gonzales v. Babco*

*Farm, Inc.*, 535 So.2d 822, 824 (La.App. 2d Cir.), *writ denied*, 536 So.2d 1200 (La.1988)).

It is well-settled that a reviewing court may not disturb the factual findings of the trier of fact in the absence of manifest error. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989); *Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1979). In *Arceneaux*, we set forth a two-part test for the appellate review of facts: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and (2) the appellate court must further determine that the record establishes the finding is not clearly wrong or manifestly erroneous. *Arceneaux*, 365 So.2d at 1333; *see also Mart v. Hill*, 505 So.2d 1120, 1127 (La.1987). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse. *Sistler v. Liberty Mutual Ins. Co.*, 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. *Stobart v. State, Through Department of Transportation and Development*, 617 So.2d 880, 883 (La.1993); *Sistler*, 558 So.2d at 1112.

In this case, the hearing officer's factual finding that the plaintiff succeeded in establishing the existence of a work-related accident was based on his determination with regard to the plaintiff's credibility. As we pointed out in *Bruno*, 593 So.2d at 361, this court in *Rosell v. ESCO* explained the concept of "clearly wrong" or "manifestly erroneous" with regard to credibility determinations as follows:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.* But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell v. ESCO*, 549 So.2d at 844-45 (emphasis added and citations omitted).

LARC and LWCC argue that the WCJ erred in finding that Mrs. Brown suffered a work-related accident on November 3, 2009. They point to several factors supporting their argument: Mrs. Brown's failure to report this incident until January 11, 2010; inconsistencies between her trial testimony and her recorded statement; the absence of any mention of a lifting incident in Dr. Korab's medical records; Dr. Juneau's reliance on Mrs. Brown's explanation for the cause of her pain and his initial finding of degenerative changes in her cervical spine; and her past history of three automobile accidents resulting in similar pain in her left shoulder.

Mrs. Brown testified that she contacted LARC about returning to work following her clearance by her cardiologist but that David Batiste, LARC's administrator, refused to allow her to return to work until she obtained an additional release from Dr. Korab. This was complicated, according to Mrs. Brown, by the fact that Dr. Korab refused to release her to return to work pending the result of her consultation with a neurosurgeon. At this early stage, Mrs. Brown recognized that she had sustained a bodily injury in addition to her heart attack, but did not realize the seriousness of that injury. She acknowledged that she did not initially relate to Ms. Grant or Mr. Batiste the connection between her non-heart-related complaints and the incident of November 3, 2009—partly because despite her pain at the time, she fully intended to return to work. In fact, the first time LARC and LWCC were informed of a possible work-related claim was correspondence from her attorney dated January 11, 2010. During the time in between, she applied for and received unemployment benefits (from mid-December 2009 to January 2010). Mrs. Brown stated that she ceased receiving

these benefits once she was no longer capable of working. At the time of trial, she had not worked for anyone since the November 3, 2009 accident.

When questioned about her recorded statement to LWCC's claims adjuster, Gerrod Galliano, Mrs. Brown admitted that some of her responses in that statement were inconsistent with her trial testimony. In her statement to Mr. Galliano, she had informed him the following concerning what she had told Ms. Redeaux about the events of November 3, 2009:

> So she say, Barbara you can't hardly breath, huh? Is [sic] say no. I say I can do the (unclear), I say, but it – it bothers me a little. I say but, my neck, something is wrong with my neck and that's what I told Connie. I say, something wrong with neck [sic].
> . . . .
> She say girl, you might have hurt yourself lifting up on Tasha. I say, Connie, I said I don't know, I said, but I know one thing, my neck is hurting and I say, I got a heart pain in my chest.

She acknowledged at trial that she never suggested to Ms. Redeaux on November 3, 2009, that she had injured herself lifting the resident; nor did she relate any complaints of neck pain to Ms. Redeaux on that day. In fact, at trial, Ms. Brown testified that she recognized the onset of neck pain a few days after being treated for the heart attack and believed it to be a "Charlie horse" caused from lifting the resident on November 3, 2009.

Mrs. Brown acknowledged that she was involved in three automobile accidents before her November 3, 2009 accident, but denied any residual effects from those accidents. The only one in which she received injuries similar to those now giving her difficulties occurred in September of 2001. After that accident, she was treated by Dr. Joseph A. George, a Rayne, Louisiana family medicine physician, and Dr. George's medical records indicate that Mrs. Brown complained of pain over C6-7 going into the left shoulder from September through November 2001. Mrs. Brown acknowledged that she suffered pain in her shoulder as a result

8

of that accident, but denied suffering from pain in her neck and down into her left shoulder and arm similar to the pain associated with the November 3, 2009 accident.

According to Mrs. Brown, Dr. George released her in December of 2001, and she experienced no residual effects from that accident or any other before her November 3, 2009 accident. Furthermore, she had no difficulty in lifting her patients as a part of her employment with LARC. The testimony of both Ms. Grant and Mr. Brown supported Mrs. Brown on this point. Ms. Grant testified that Mrs. Brown was a good, hard-working, dependable employee, who never complained of any health issues. Mr. Brown acknowledged the history of the 2001 accident and his wife's treatment with Dr. George, but also testified that she had not complained of neck or back pain since her release from Dr. George. Mr. Brown did testify that while being treated for her heart attack, Mrs. Brown complained to him that her neck was bothering her. However, the seriousness of her heart attack overshadowed the significance she gave her neck pain.

Ms. Grant testified that not only did Mrs. Brown not tell her of the back and shoulder injury during or after her heart attack, but that when she telephoned Mr. Brown to check on his wife's status, he did not mention it either. However, she also acknowledged that she only spoke to Mrs. Brown one time after the accident, in a telephone conversation with her a few days after November 3, 2009.

Dr. Juneau testified that Mrs. Brown's cervical MRI was abnormal from the beginning because she had bony foraminal stenosis at two levels and a protruding disc off to the left side, and that by May of 2011, her symptoms had lateralized off to the left side. He explained that the symptoms in her fingers are a classic sign of C7 nerve-root irritation, and that Mrs. Brown's minimal disc protrusion at C6-7

9

prominently narrowed the foramen on the left side. Dr. Juneau opined that Mrs. Brown's neck pain resulted from the work-related injury at LARC on November 3, 2009. He reached this conclusion based primarily on the fact that her symptoms of neck and back pain began almost immediately after November 3, 2009. Dr. Juneau also stated that in reaching this conclusion, he was aware of the history of the 2001 automobile accident. According to the doctor, had Mrs. Brown suffered residual pain from that injury, she would not have been able to perform her duties at LARC.

Mr. Galliano testified that prior to taking Mrs. Brown's statement, he met with Ms. Grant, Mr. Batiste, and others at LARC. After taking her statement, he then discussed the events of November 3, 2009, with Ms. Redeaux. When Ms. Redeaux assured him that Mrs. Brown made no mention of neck pain on the day of the accident, he denied Mrs. Brown's claim as not being associated with an on-the-job accident. However, Mr. Galliano also admitted that when he denied the claim, he had no medical opinion contradicting Dr. Juneau's opinion as to the cause of Mrs. Brown's neck pain. He stated that Dr. Korab's medical records contained no indication that Mrs. Brown injured herself while lifting a patient. Mr. Galliano testified that his decision to deny Mrs. Brown's claim has in no way been altered by Dr. Juneau's subsequent opinions because he does not believe that Dr. Juneau can definitively relate her cervical problems to the November 3 lifting incident. He admitted that LARC and LWCC has not paid Mrs. Brown indemnity benefits or medical bills nor has it paid for rehabilitation or offered her vocational rehabilitation services.

In her oral reasons for judgment, the WCJ held that Mrs. Brown proved that her medical condition resulted from a work-related accident on November 3, 2009.

The WCJ found Mrs. Brown's testimony credible, discounting the inconsistencies between her recorded statement and her trial testimony. The WCJ stated:

> Considering the fact that on the date of the alleged accident she suffered a heart attack, the Court does not find that Brown's memory in this regard casts serious doubt on her credibility. In fact, the Court finds it quite understandable given the circumstances that she is confused about having mentioned the lifting incident to anyone. The Court finds Brown's testimony credible. Moreover, the jurisprudence is replete with cases that hold that an acute trauma can mask a secondary source of pain until the acute trauma starts to subside.

Based on the totality of the evidence, particularly the testimony of Mrs. Brown and that of her husband, Ms. Grant, and Dr. Juneau, as well the medical records, the WCJ held that Mrs. Brown proved she suffered a work-related accident on November 3, 2009. She found that Mrs. Brown had worked since 2001, without any complaints of pain and that Ms. Grant admitted that Mrs. Brown had made no such complaints during the seven months of her employment with LARC.

After reviewing the record, we find no error in the WCJ's factual finding that Mrs. Brown injured her neck while lifting a resident at LARC on November 3, 2009, the same morning that she suffered a heart attack. The WCJ specifically found Mrs. Brown's testimony credible and the evidence overwhelmingly in support of the finding that she injured her neck in a work-related accident. Considering the life-threatening situation in which she found herself that morning, it is not at all astonishing that Mrs. Brown either was unaware of her neck injury or that she did not tell Ms. Grant this. Other than the inconsistent statement that Mrs. Brown spoke with Ms. Redeaux about a possible injury while in the throes of her heart attack, all of the evidence, especially the medical evidence, corroborates Mrs. Brown's version of what occurred. We further find it inconceivable that Ms. Grant would have taken the time to question Mrs. Brown about her neck pain while she

was experiencing a life-threatening condition. Accordingly, the WCJ's judgment finding that Mrs. Brown satisfactorily proved causation is affirmed.

***Penalties and Attorney Fees***

LARC and LWCC next argue that the WCJ erred in awarding Mrs. Brown statutory penalties and attorney fees and in awarding an additional penalty for their failure to approve the surgery recommended by Dr. Juneau.

An employer avoids the imposition of penalties and attorney fees when it engages in a "nonfrivoulous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time [it] refused to pay all or part of the benefits allegedly owed." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La. 12/1/98), 721 So.2d 885, 890 (alteration ours); La.R.S. 23:1201(F).

> Importantly, this obligation is continuing in nature. *Parfait v. Gulf Island Fabrication, Inc.*, [97-2104 (La.App.1 Cir. 1/6/99),] 733 So.2d [11,] 25. Where, as here, an insurer or employer first receives a favorable medical report, but later receives information indicating the possibility of a continuing disability, it may not blindly rely on the earlier report to avoid attorney fees. *Killett v. Sanderson Farms*, [01-277 (La.App. 1 Cir. 5/10/02),] 818 So.2d [853,] 862. Statutes authorizing attorney fees in workers' compensation cases are imposed to discourage indifference and undesirable conduct by employers and insurers. *Williams v. Rush Masonry, Inc.*, 98-2271 (La.6/29/99), 737 So.2d 41, 46.

*Connor v. Family Dollar Store*, 09-1537, pp. 14-15 (La.App. 1 Cir. 3/26/10), 36 So.3d 339, 350, *writ denied*, 10-959 (La. 6/25/10), 38 So.3d 344.

The decision to cast an employer with penalties and attorney fees is a question of fact subject to the manifest error standard of review. *Ashworth v. Administaff, Inc.*, 10-318 (La.App. 3 Cir. 10/6/10), 48 So.3d 1178.

LARC and LWCC's argument that they were not arbitrary and capricious in the handling of this claim centers around the facts they knew early in the history of this matter, especially the above-described inconsistent statement contained in Mrs.

Brown's recorded statement. LARC and LWCC also point to testimony from Mrs. Brown on cross examination, where she admits that it was reasonable for Mr. Galliano to question whether she suffered a work-related injury.

In awarding penalties and attorney fees, the WCJ found LARC and LWCC arbitrary and capricious in their handling of Mrs. Brown's claim not because of their actions early in the handling of the claim. Rather, the WCJ held that once they became aware of Dr. Juneau's later opinions and, based on the fact that they had alleged no intervening cause for her neck pain, LARC and LWCC clearly should have known that her disability resulted from the November 3, 2009 work-related accident.

After reviewing the record, we find LARC and LWCC's argument ignores the facts before them. The WCJ specifically found their actions in initially handling this claim reasonable, but not so their later actions. The WCJ stated, "While the initial demand of the claim is understandable given the circumstances surrounding the accident, subsequent information regarding the accident and injury do not justify the insurer's and employer's continued denial of compensation and medical benefits." We further find that while Mrs. Brown might admit under leading questioning that it was reasonable for LARC and LWCC to deny her claim, her belief has no bearing on whether their actions, ultimately, were arbitrary and capricious. As we find no manifest error in the WCJ's finding, the award of penalties and attorney fees is affirmed.

We further find no error in the WCJ's award of a $2,000.00 penalty based on the failure of LARC and LWCC to authorize the surgery recommended by Dr. Juneau. LARC and LWCC argue that the failure to authorize medical benefits and the failure to authorize surgery are the one and the same claim. We disagree. In

13

her March 3, 2010 disputed claim, Mrs. Brown alleged that LARC and LWCC refused to authorize medical treatment and listed four medical tests recommended by Dr. Juneau. These tests were not authorized. By the date of trial, Dr. Juneau recommended that Mrs. Brown undergo surgery. LARC and LWCC also refused authorization for the surgery. Louisiana Revised Statute 23:1201(F) provides for statutory penalties based on an employer's failure to pay medical benefits timely. The failure to authorize a necessary medical procedure is considered a failure to furnish medical benefits as required by La.R.S. 23:1203, which subjects the employer to penalties and attorney fees. La.R.S. 23:1201(F). In this instance, we find that there were two violations of La.R.S. 23:1203 by LARC and LWCC. Accordingly, the WCJ's award of a penalty based on LARC and LWCC's failure to authorize the recommended surgery is affirmed.

*Answer to Appeal*

In her answer to appeal, Mrs. Brown requests that we award her additional attorney fees for the legal services rendered by her counsel in successfully defending this appeal. Accordingly, we award her an additional $5,000.00 in attorney fees for legal services rendered on appeal.

## DISPOSITION

For the foregoing reasons, we affirm the judgment of the workers' compensation judge. We further render judgment to award an additional $5,000.00 in attorney fees for legal services rendered by Mrs. Brown's counsel's successful defense of this appeal. The costs of this appeal are assessed to the Lafayette Association of Retarded Citizens, Inc. and the Louisiana Workers' Compensation Corporation.

**AFFIRMED AND RENDERED.**

14

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1595

BARBARA BROWN

VERSUS

LAFAYETTE ASSOCIATION OF RETARDED CITIZENS, INC.

**GREMILLION, Judge, concurs in part and dissents in part and assigns written reasons.**

I concur in that the worker's compensation judge did not commit manifest error in finding the claimant met her burden of proof that she was injured by an accident on the job.

I dissent with regard to the majority's findings regarding penalties and attorney fees. I would reverse the trial court.